CITIZEN'S NATIONAL BANK OF WILLMAR, Respondent,

v.

Douglas W. TAYLOR, Appellant.

No. C4–83–842.

Supreme Court of Minnesota.

June 7, 1985.

Douglas W. Taylor, pro se.

L. Wayne Larson, Willmar, for respondent.

AMDAHL, Chief Justice.

Appellant Douglas Taylor appeals from the judgment of the trial court finding him liable to respondent Citizen's National Bank of Willmar on three promissory notes in the amount of $48,991.96, together with 15% interest computed from September 9, 1982. The trial court issued a post-trial order confirming the sale of personal property to satisfy the indebtedness and later denied a motion by appellant to reconsider the confirmation of the sale. Appellant appeals from the adverse judgment, contending that he was denied his right to a jury trial; that the rate of interest on the notes was usurious; that the respondent fraudulently altered the notes; and that the sale of the personal property was commercially unreasonable and should not have been approved. We affirm in part, reverse in part, and remand for modification of the amount of the judgment.

Respondent Citizen's National Bank of Willmar commenced this action to recover on three promissory notes executed by appellant Douglas Taylor. Taylor signed the first demand note in the amount of $37,-448.41 on September 15, 1980. This note represented a renewal of Taylor's obligation under several previous notes. On October 2, 1980, Taylor signed a second note for $1,000. Taylor signed a third note for $4,680 on October 22, 1980. The demand notes called for interest at a stated rate of 15%. The appellant used the proceeds in his farming operation, and the notes were secured by farm equipment.

Interest was due on the demand notes every 6 months, and was therefore due on Taylor's notes in March of 1981. The first, and largest, of the three notes indicates that the bank sent its usual notice of the amount due to Taylor on March 10, 1981. The bank then sent a letter to Taylor on April 1, 1981, saying that it had not received a response from him about the note that had come due, and asking Taylor to contact the bank upon receipt of the letter. The first note also indicates that the bank sent Taylor yet another notice on its standard form on April 29, 1981.

The second note indicates that the bank sent Taylor a notice of amount due on March 30, 1981, and again on April 29, 1981. The third note shows that notice was sent on it on April 29, 1981. Finally, the third note indicates that a letter was sent to Taylor regarding his indebtedness on June 2, 1981. In that letter, the bank noted that Taylor had not responded to previous letters concerning the notes, and asked Taylor to "stop in right away and take care of these past due items." Taylor testified that he did not receive any of these notices or letters. The bank officer to whom returned mail is brought testified that these notices were not returned undelivered. The bank received no response from Taylor.

On May 26, 1981, the bank sent Taylor the following letter:

Your three notes came due May 1, 1981, in excess of $40,000.00. The interest on those notes effective today is 22½%.

It is necessary that you stop in the bank and pay the interest to bring the notes current and take them off a past due status. You should do that this week.

The three notes were altered by crossing out the 15% interest figure in pencil and writing in its place on the face of each note "22½ eff. 5/26/81." Paul Peterson, the loan officer who dealt with Taylor, said the notes would have been changed on the date indicated, May 26. The alteration was not made by Peterson, but by a bank employee in accordance with what Peterson described as "normal banking procedures" when a demand note is overdue. Peterson testified that in May of 1981, interest rates were

changing and the bank renewed demand notes as they came due at the current rate. The bank would notify the customer and change the note. Peterson testified that the bank always notified the customer when it changed the interest rate on any note, and that interest rates have been lowered, as well as raised, in this manner in the past.

Taylor admitted that he received the bank's May 26 letter. Taylor apparently did not go to the bank before June 8 because the bank sent him a letter on that date advising him that no more credit would be extended and that the bank expected full payment on the notes "around the first of July." Taylor eventually went to the bank and discussed his situation with loan officer Peterson. As a result of this visit, the bank agreed to extend the notes to August 1, 1981. A statement that the notes were extended was stamped on the back of each note, Peterson initialed the back of each note, and Taylor signed on the back of each note.

At Taylor's request, Peterson later extended the notes to September 10, 1981. Taylor did not pay anything on the notes until December 3, 1981. On that day, Taylor paid the bank $7,114.44 on the notes. Upon accepting this payment, the three notes were canceled and the parties executed a fourth demand note in the amount of $40,663.02 to reflect the aggregate indebtedness originally represented by the first three notes.

The bank discovered that the principal amount on the fourth note was incorrect and Peterson called Taylor on December 4, asking him to come in and sign a new, correct note. The bank had omitted the interest charge of 22½% on the largest note in computing the principal amount on the fourth note. The bank therefore requested that Taylor sign a fifth note in the amount of $45,710.92 to correctly reflect the debt owed. Taylor then wrote to the bank on December 10, requesting a "written statement of interest rates charged, how calculated, including dates and amount due on my current loan with your bank."

The bank complied with this request on January 6, 1982, providing Taylor with the following calculations:

| Note # | Amount | Interest from | |
|---|---|---|---|
| 33142 (first note) | $37,448.41 | 9–15–80 to 5–26–81 15% | $3,947.69 |
| | | 5–26–81 to 12–3–81 22½% | $4,470.40 |
| | | Total: | $8,418.09 |
| 33201 (second note) | $ 1,000 | 10–2–81 to 5–26–81 15% | $98.33 |
| | | 5–26–81 to 12–3–81 22½% | $119.38 |
| | | Total: | $217.71 |
| 33283 (third note) | $ 4,680 | 10–22–80 to 5–26–81 15% | $421.20 |
| | | 5–26–81 to 12–3–81 22½% | $558.68 |
| | | Total: | $979.88 |

| | |
|---|---|
| Total Principal: | $43,128.41 |
| Total Interest Due: | 9,615.68 |
| Check Account OD | 81.27 |
| | 52,825.36 |
| Less grain check | 7,114.44 |
| New Note | $45,710.92 |

Taylor's denial of the request to sign the fifth note prompted the bank to abandon any demands based upon the fourth note and to commence this action to recover on the three original notes. Items of Taylor's personal property securing the indebtedness were later seized, notice of sale was provided, and the items were sold for the aggregate price of $13,343.

1. After the bank sued Taylor to recover on the three demand notes, Taylor counterclaimed for damages, alleging that the bank had charged him usurious interest, and for punitive damages, alleging that the bank had fraudulently altered the notes with willful indifference to Taylor's rights. Taylor requested a jury trial. The trial court impaneled a jury and the jury heard all the testimony and viewed all the exhibits. At the close of the evidence, the trial court granted the bank's motion to dismiss the claim for punitive damages, and released the jury.

The trial court then issued findings of fact and conclusions of law, finding Taylor liable on the notes according to their original tenor. In reaching its conclusion, the trial court found that the bank altered the notes in the good faith, but mistaken, im-

pression that it could change the interest rate after a default on a demand note. The court concluded that the alteration was not fraudulent. The court also found that Taylor consented to the alteration. Taylor contends that the questions of fraud and consent are questions of fact and should have been submitted to the jury for determination. Taylor claims that the trial court denied him his constitutional right to trial by a jury by proceeding as it did.

 Although the trial court did not indicate that it directed a verdict on the issues of fraud and consent, it in effect did so. This court has held that direction of a verdict, where warranted by the evidence, does not violate the constitutional right to a jury trial. *Anderson v. Sears, Roebuck & Co.,* 223 Minn. 1, 7, 26 N.W.2d 355, 358 (1946), *overruled on other grounds, Ryan v. Griffin,* 241 Minn. 91, 62 N.W.2d 504 (1954); *Kernan v. St. Paul City Ry. Co.,* 64 Minn. 312, 313, 67 N.W. 71, 72 (1896). In reviewing the grant of a directed verdict, this court makes an independent assessment of its appropriateness. A motion for a directed verdict presents a question of law for the trial court: whether the evidence is sufficient to present a fact question for the jury to decide. A directed verdict should be granted only in cases where, in light of the evidence as a whole, it would be the duty of the trial court to set aside a contrary verdict as manifestly contrary to the evidence or contrary to the law applicable in the case. In considering the motion, the court must accept as true the evidence favorable to the adverse party and all reasonable inferences which can be drawn from the evidence. *Reinhardt v. Colton,* 337 N.W.2d 88, 94 (Minn.1983); *Walton v. Jones,* 286 N.W.2d 710, 714 (Minn.1979).

Minn.Stat. § 336.3–407(2)(a) (1984) provides that:

> (2) As against any person other than a subsequent holder in due course
>
> (a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense * * *.

Taylor claimed that he was discharged from his obligation under all three notes because the bank fraudulently altered the interest rate on the notes. In order to prevail, Taylor had to show that the alteration was (1) made by the holder of the note, (2) was material, and (3) was made for a fraudulent purpose. *Logan v. Central Bank of Alabama, N.A.,* 397 So.2d 151, 152 (Ala.Civ.App.1981). The bank was clearly the holder of the notes, *see* Minn.Stat. § 336.1–201(20) (1984), and the change in interest rate from 15% to 22 ½% was clearly material. The trial court found, however, that the bank did not fraudulently alter the note.

 Fraud, under the Uniform Commercial Code, "requires a dishonest and deceitful purpose to acquire more than one was entitled to under the note as signed by the maker rather than only a misguided purpose." *Bluffestone v. Abrahams,* 125 Ariz. 42, 45, 607 P.2d 25, 28 (Ariz.Ct.App. 1979). *Accord, Bank of Ripley v. Sadler,* 671 S.W.2d 454 (Tenn.1984); *Logan,* 397 So.2d at 151; *Thomas v. Osborn,* 13 Wash. App. 371, 536 P.2d 8 (Wash.Ct.App.1975). The general rule is that a party seeking discharge on an instrument under 3–407 must show that the holder altered the instrument with a deceitful purpose.[1] "Misguided" behavior alone does not effect a discharge.

---

1. For cases finding that 3–407(2)(a) requires a showing of intent to defraud, without describing the attributes of the required intent, *see Gaffin v. Heymann,* 428 A.2d 1066 (R.I.1981); *Shinn v. First National Bank of Hope,* 270 Ark. 774, 606 S.W.2d 154 (Ark.Ct.App.1980); *Lawler v. Federal Deposit Insurance Corp.,* 538 S.W.2d 245 (Tex. Civ.App.1976); *Van Norden v. Auto Credit Co., Inc.,* 109 Ga.App. 208, 135 S.E.2d 477 (Ga.Ct. App.1964). *But see Hutcheson v. Herron,* 131 Ill.App.2d 409, 266 N.E.2d 449 (1970) (court, relying on *Illinois* comment to 3–407, found that fraud requires a finding that alteration attempted to impose an obligation upon the maker additional to his obligation when he signed the instrument, apparently with no requirement of deceitful intent.)

The evidence at trial supports the directed verdict finding that the bank did not alter Taylor's notes with fraudulent intent. The evidence showed that the bank notified Taylor several times that his notes were due. The bank notified Taylor of the change in interest rate on the day the alterations were made, and Taylor admitted receiving this notice. Bank officers testified that they thought they were entitled to renew overdue demand notes at the current rate if the customer was given notice, and said that as notes came due in May of 1981, they were changing notes in this way. They also said that they had lowered interest rates on notes in this manner in the past if the market rates were lower than the interest rate on the note. This was described as a "normal banking procedure." There was no evidence tending to show deceit on the part of the bank in their dealings with Taylor on the notes. The trial court's directed verdict on the issue of fraud was proper. Language from *Thomas v. Osborn* is descriptive of the situation here:

> The actions of the parties here are best characterized by the term "misguided." The trial court did not find a dishonest, fraudulent intent in the payee, and the chaotic dealings of the parties reveals that their understanding of the legal ramifications of their actions was limited.

*Thomas* at 378, 536 P.2d at 13.

Under Minn.Stat. § 336.3–407(2)(a) (1984), fraudulent alteration of an instrument does not discharge a party if that party consents to the alteration. The trial court, after finding that the bank did not fraudulently alter the instrument, also found that Taylor consented to the alteration. The evidence supports the trial court's directed verdict finding of consent. Taylor was notified of the change in interest rate and later signed an extension of the notes after the alteration had taken place. Peterson testified that he and Taylor specifically discussed the interest rate and that Taylor said the rate was "awfully high." Taylor said the May 26 letter made him aware that the bank wanted to charge 22½% interest. We affirm the trial court's direction of the verdict on the issue of consent.

2. Four elements must be proven to establish a violation of the usury laws:

1) a loan of money or forbearance of debt,

2) an agreement between the parties that the principal shall be repayable absolutely,

3) the exaction of a greater amount of interest or profit than is allowed by law, and

4) the presence of an intention to evade the law at the inception of the transaction.

*Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 230, 219 N.W.2d 641, 646 (1974); *Schauman v. Solmica Midwest, Inc.*, 283 Minn. 437, 439, 168 N.W.2d 667, 669–70 (1969). It is clear that the bank loaned money to Taylor and that the notes require Taylor to repay the principal absolutely. The first two elements of a usury violation are therefore present.

The third element, exaction of a greater amount of interest than is allowed by law, is also clearly present. Minn.Stat. § 334.011, subd. 1 (1984), establishes the maximum rate of interest for business and agricultural loans under $100,000 as a rate not in excess of 4½% over the discount rate on 90-day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve district including Minnesota. The trial court found that the maximum legal rate of interest under section 334.011 was 18½% in May of 1981. Both parties accept this finding. The interest rate on the notes of 22½% was therefore greater than legally allowed. It is also clear that the bank *exacted* this interest because the trial court found that Taylor consented to the alteration of the notes to 22½%. This consent established a contract to pay 22½% interest on the debt Taylor owed the bank. As this court has said:

> There can be no usury without a *contract* obligating the debtor to pay interest or return in excess of that provided

by law, or else an actual payment or retention by the lender of such excessive interest. * * *

\* \* \* \* \* \*

What is condemned is the actual taking or receiving of excessive interest, or the inclusion in the contract, otherwise valid, of a contract obligation to pay excessive interest.

\* \* \* \* \* \*

*Linne v. Ronkainen,* 228 Minn. 316, 320–21, 37 N.W.2d 237, 239–40 (1949) (citations omitted), *quoting Blindman v. Industrial Loan & Thrift Corp.,* 197 Minn. 93, 96–98, 266 N.W. 455, 456–57 (1936).

The final element, intent to evade the law at the inception of the transaction, was also present. The trial court found that the bank had no intent to charge Taylor a usurious rate of interest. The trial court apparently thought that the bank needed to know that it was charging a usurious rate in order to satisfy the in-

tent requirement. This court has said, however, that the required intent "consists in the intent to take or receive more for the forbearance of money than the law permits, and this is true whether or not the taker knows he is violating the usury law." *Cemstone Products Co. v. Gersbach,* 187 Minn. 416, 419, 245 N.W. 624, 625 (1932). Thus, if a lender intentionally charges an interest rate that is in fact usurious, it is presumed that he intends the natural consequence of his act—a usury violation. *Rathbun,* 300 Minn. at 236, 219 N.W.2d at 650; *Midland Loan Finance Co. v. Lorentz,* 209 Minn. 278, 287, 296 N.W. 911, 915 (1941). In this case, the bank clearly intended to charge Taylor 22½ interest on his debt when it altered the notes and when Taylor consented to the alteration. The trial court's finding of lack of intent, apparently based upon a misapprehension of the law, was clearly erroneous. The four elements of usury were therefore established.[2]

2. The trial court, despite its finding that Taylor consented to the alteration of the notes to reflect an interest rate of 22½%, allowed the bank to enforce the notes according to their original tenor, with an interest rate of 15%. The trial court reasoned that the bank could enforce the note in its altered form if it did not provide for usurious interest, and then permitted the bank to enforce the note according to its original tenor under section 336.3–407. Section 336.3–407(2)(a) (1984) provides that fraudulent alteration of an instrument discharges any party whose contract is changed *unless* the party consents to the alteration, and section 336.3–407(2)(b) (1984) provides that—

no other alteration discharges any party and the instrument may be enforced according to its original tenor * * *.

The question of law presented by the trial court's conclusion is whether an instrument can be enforced according to its original tenor after it is altered and the other party consents to the alteration.

Generally, an alteration that is consented to may be enforced against the consenting party. *Bluffestone v. Abrahams,* 125 Ariz. 42, 45, 607 P.2d 25, 28 (Ariz.Ct.App.1979); *Teratron General v. Institutional Investors Trust,* 18 Wash.App. 481, 488, 569 P.2d 1198, 1202 (Wash.Ct.App. 1977). Once an alteration is consented to, a holder should not have the option of enforcing either the original agreement or the new agreement; the original agreement has, in essence, ceased and been replaced by the new one. As

the New York Supreme Court said in applying 3–407:

The remaining question is whether the court properly enforced the instrument as bearing the higher rate of interest according to its altered terms. The estate argues that paragraph (b) requires that the instrument be "enforced according to its original tenor" and not as altered. We disagree. We read paragraph (b) as intended to apply to circumstances other than those covered by paragraph (a), i.e., to apply where there has been an alteration which is not both fraudulent and material and to which the obligor has not assented. In such a case, the obligor is not discharged and the instrument will be "enforced according to its original tenor" pursuant to paragraph (b). In contrast, where, as here, the alteration by the holder is made with the assent of the obligor, paragraph (b) does not apply and the instrument as altered should be given effect. This comports with a commonsense reading of the statute; it would be anomalous to hold that although the obligor assented to the change and thus is not discharged under paragraph (a), he is not bound by the agreed-upon change under paragraph (b).

*In re Estate of Pickard,* 97 App.Div.2d 61, 62, 468 N.Y.S.2d 264, 264–65 (N.Y.App.Div.1983) (citations omitted). There was only one contract to enforce, represented by the notes as altered. Once Taylor consented to the alteration, the bank could only enforce the notes as altered. The bank could not go back and enforce the

Minn.Stat. § 334.011, subd. 2 (1984), provides that:

> If a greater rate of interest than that permitted by subdivision 1 is charged then the entire interest due on that note, bill or other evidence of debt is forfeited. If the greater rate of interest has been paid, the person who paid it may recover in a civil action an amount equal to twice the amount of interest paid.

The trial court found that Taylor was never charged nor did he pay interest in excess of 15% on the notes. The trial court noted that Taylor did pay the bank $7,114.44 on December 3, 1981. Taylor testified that 15% interest on his debt from September 1980 to December 1981 would amount to about $8,000. The trial court apparently concluded, based on this, that Taylor had not paid, nor had he been charged, 22½% interest.

It is clear, however, that the bank *charged* 22½% interest on the notes after May 26, 1981. The alteration, agreed to by Taylor, established a contract to pay 22½% interest on the debt. This would constitute "charging" usurious interest under section 334.011, subd. 2. The distinction the statute draws in assessing different penalties for being charged usurious interest and actually paying it is between being *obligated* to pay the interest in the future and having already paid it. The bank did

charge 22½% interest on Taylor's notes and would therefore forfeit the whole interest accrued on the debt from the time it began to charge the usurious rate, May 26, 1981. Taylor would, under the statute, remain liable for the principal and 15% interest accrued up to the alteration of the contract that caused it to be usurious.[3] We remand to the trial court for adjustment of the amount of the judgment to reflect the statutory penalty for usury.

3. Taylor contends that the farm equipment sold by the bank pursuant to its rights under the security agreements securing the notes was sold in a commercially unreasonable manner. Taylor claims that the trial court erred in approving the sale because the reasonable value of the equipment was $27,171.80, while the sale proceeds were only $13,343.

Minn.Stat. § 336.9–504, subd. 3 (1984), provides that:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

\* \* \* \* \* \*

---

notes according to their original tenor, and specifically could not use this device to escape from the penalty for violating the usury laws by pretending the usurious agreement somehow did not exist.

3. It also appears that Taylor did pay 22½% interest on the two smaller notes. The back of the second note indicates an interest payment of $217.71 on December 3, 1981. The bank's own calculations show that it assessed 15% interest on the note to May 26, 1981 ($98.33), and assessed 22½% interest from May 26, 1981, to December 3, 1981 ($119.38), for a total interest payment of $217.71. The back of the third note indicates an interest payment of $979.88 on December 3, 1981. Again, the bank's calculations show that it assessed 15% interest on the note to May 26, 1981 ($421.20), and 22½% interest from May 26, 1981, to December 3, 1981 ($558.68), for a total payment of $979.88. It seems indisputable that Taylor paid 22½% interest on notes 2 and 3 from May 26, 1981, to

December 3, 1981. The total payment was $678.06 for this time, so Taylor should be entitled to recover twice that amount under Minn. Stat. § 334.011, subd. 2 (1984).

Whether Taylor paid 22½% interest on the first note is problematic. Note 1 indicates an interest payment of $3,370.19 on December 3, 1980. The bank computed the interest owed as $3,947.69 from September 1980 to May 26, 1981 (15% rate) and $4,470.40 from May 26, 1981, to December 3, 1981 (22½% rate). It is not apparent what rate of interest the $3,370.19 payment represents. It is likely, however, that it does *not* represent 22½% interest because when the bank rolled Taylor's obligation on the three notes into the fourth note, it erroneously omitted the 22½% interest charge on the first note from May 26 to December 3. The bank intended the fifth, unsigned note to rectify this error. The $3,370.19 interest payment therefore appears to represent part of the 15% interest owed prior to the alteration of the note to 22½%.

Minn.Stat. § 336.9–507, subd. 2 (1984), provides that:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

\* \* \* \* \* \*

The bank sold Taylor's farm equipment by advertising for bids in the Willmar paper on June 10, 11, 12, and 14, 1982. The advertisement described the items for sale, a car, tractor, planter and cultivator, and requested sealed bids. Taylor was notified on May 19, 1982, that the bank would offer the items for sale. The bank reserved the right to reject all bids, an officer discussed the bids with two implement dealers, and decided to accept the bids. Taylor did acknowledge in his brief that "in a foreclosure sale there can be much less money realized from the sale of items than those items would normally be worth." Taylor's allegation that better prices might have been obtained was insufficient to establish that the trial court erred in ruling that the bank sold the property in a commercially reasonable manner.

Affirmed in part, reversed in part, and remanded for modification of the amount of the judgment.