**Margaret P. CLAFLIN, Appellant,**

v.

**COMMERCIAL STATE BANK OF TWO HARBORS, Respondent.**

**No. C1-91-2416.**

Court of Appeals of Minnesota.

June 2, 1992.

Review Denied Aug. 4, 1992.

Bryan N. Anderson, Crassweller, Magie, Andresen, Haag & Paciotti, P.A., Duluth, for appellant.

Joseph J. Mihalek, Rolf A. Lindberg, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, for respondent.

Considered and decided by NORTON, P.J., LANSING and DAVIES, JJ.

## OPINION

NORTON, Judge.

Appellant Margaret Claflin seeks review of a judgment dismissing her claims against respondent Commercial State Bank of Two Harbors. Margaret sought to have set aside two mortgages the Bank had taken in exchange for loans granted to her son, Gregory, while he held record title to her home. Margaret also sought punitive damages. After presentation of Margaret's evidence in the jury trial, the Bank's motion for a directed verdict was granted, dismissing all counts. The trial court held that the Bank had no duty to investigate beyond the record title and that there was no evidence of any willful action by the Bank against Margaret. We reverse.

## FACTS

The issues in this case arise from an apparent fraud perpetrated by Greg Claflin, who is not a party here. Greg's parents, Margaret and Amos Claflin, bought the real estate in question (the "Property") in 1973. The Property consists of a two-story home on about 40 acres in rural Two Harbors, Minnesota. In 1988, Amos died. Greg and his wife Mary returned to Two Harbors for Amos' funeral and decided to relocate there. With financing from Mary's parents, they purchased a foreclosed home from respondent Commercial State Bank of Two Harbors.

Greg did not find work in Two Harbors until January of 1989, when he obtained an insurance sales position. Every Friday, Greg gave Mary a receipt purportedly reflecting the bank deposit of his paycheck. In fact, Greg bolstered his checks with cash advances on credit cards he obtained without Mary's knowledge. Mary worked until November 1989, when their son was born.

During late 1989, Greg began persuading his mother to enter into an arrangement that, he asserted, would benefit them both. Greg testified that his mother was concerned about retirement income. He concocted a phony W–2 form for 1989, indicating earnings of approximately $70,000, to convince her that he was doing well financially and needed additional tax deductions. Greg convinced his mother that if she would sell him the Property, he would receive a tax break and she would have a new source of income. Greg convinced his mother that he would make monthly payments for the Property and she could live there for the rest of her life.

By January of 1990, Greg finally convinced his mother to sign two documents. One was a note (the "Note") which Greg drafted by copying portions of the mortgage he and Mary gave her parents. The Note provides that Greg will pay $90,000 in payments of $300 per month for 25 years, in exchange for which Margaret can live at the Property for as long as she chooses. The Note provides that Greg can never sell the Property to anyone other than his mother and that if Greg should die, the Property would revert back to her, that she would owe nothing to Greg's estate and

would receive title to the Property free and clear. The Note also provides Margaret remedies in the event of Greg's default, including a right to foreclose. Greg convinced his mother that, to prevent family jealously and conflict, they must keep the deal secret.

Greg had his mother come to his office to sign the Note and have it notarized. Margaret's testimony indicates that she did not consider whether the Note should be recorded against the Property; she believed it was 'official' because it was notarized.

Mother and son also went to the county recorder's office. There, Greg obtained a blank Minnesota Uniform Conveyancing Quit Claim Deed which he prepared, and had his mother execute before a notary. By this deed, which was duly recorded, Margaret quit claimed the Property to Greg. Both documents were executed and notarized on January 25, 1990; only the deed was recorded.

On February 2, 1990, Greg applied to the Bank for a loan to be secured by a mortgage on the Property (the "mortgage loan"). He told Bank Vice President Lance Schwanke that the purpose of the loan was to consolidate unsecured debt. Greg obtained a loan application and had his wife sign it before it was completed. On the loan application, Greg misrepresented his income, stating that he had earned approximately $24,000 in the past year; his company verified earnings of $15,000. Greg also inconsistently indicated both an employer for Mary and that she was unemployed. Mary had decided not to resume work outside the home after their son was born. Greg listed debts of approximately $22,000 on about sixteen credit cards.

Greg and Schwanke agreed that the Bank would grant Greg and Mary a mortgage loan for $30,000 on the Property at one interest rate and would grant a $15,000 line-of-credit mortgage loan at a higher interest rate. Both mortgage loans were processed together and will be referred to hereinafter as one.

Mary believed Greg was obtaining a mortgage loan on their *own* residence. By the time Greg told Mary about the loan, she had decided they would separate. Although the Bank had not yet received a title opinion or an appraisal of the Property, Schwanke agreed to have Mary pre-sign all the documents on February 9th because Greg said she was going on 'an extended vacation.'

Schwanke went to Greg and Mary's home with the mortgage loan documents on the evening of February 9, 1990. The evidence demonstrates that portions of these documents were not completed when Mary signed them. While it is not clear what information was contained at that time, none of the completed documents in evidence contain the street address of the Property; they contain a lengthy legal description. Mary testified that she did not read the documents, but simply executed them that evening. Mary and her infant son left Minnesota on February 13, 1990, to reside with Mary's parents in Philadelphia.

On February 21, 1990, Schwanke wrote to an attorney in Two Harbors requesting that he prepare a first mortgage note in the names of Gregory and Mary Claflin. Schwanke also requested preparation of a first mortgage deed as security for the note, evidenced by an abstract of title on the "Amos Claflin property." The letter states that the closing is to be ASAP and that the tax statements should be sent to Greg and Mary Claflin at their home in Two Harbors. Schwanke also sent a letter to a realty office affiliated with the Bank, requesting an appraisal on the "Amos Claflin property—contact Greg Claflin only."

On March 15, a title opinion was issued indicating title was vested in fee simple in Gregory Claflin, subject to exceptions including, *inter alia*, "possessory rights of occupants other than the fee owner of said premises." On March 17th, the appraiser sent a letter to the Bank regarding the "Amos Claflin appraisal" indicating that the Property had a value of $92,000.

The mortgage loan documents were *then* dated March 21, 1990 and notarized by Schwanke, who had in fact witnessed the signatures on a much earlier date. The proceeds were disbursed to Greg, mainly through fourteen cashier's checks issued to

various unsecured creditors. Additional cashier's checks were disbursed for expenses related to the mortgage. After April 13, 1990, only $1300 of the original $45,000 remained undisbursed.

One evening in June of 1990, Mary, still in Philadelphia, learned that Greg had acquired a new truck. Mary immediately called Schwanke at home regarding the source of these funds. Mary then learned for the first time that the documents she signed for Greg in February placed a mortgage on Margaret's home. Mary immediately insisted that all disbursements be stopped.

Schwanke testified that Mary complained only about Greg's use of the proceeds, not about their source. The morning after calling him, however, Mary wrote a letter to Schwanke at the Bank. She stated that the accounts had been "misrepresented" to her, that she had been under the impression the loan involved a second mortgage against *her* residence and that she had just learned that the "second mortgage" was actually against the Property which, she stated, "I had no knowledge of owning." This letter was received by the Bank on June 12, 1990; the account ledger carries a notation dated 6/11/90 to stop all advances on the account. Mary then arranged a trip to Minnesota.

When Mary arrived the Claflin family held a meeting. Margaret learned for the first time that Greg had mortgaged the Property, contrary to their understanding. Mary learned that Margaret had conveyed the Property to Greg in a secret deal. Margaret retained an attorney who insisted that Greg and Mary immediately convey the Property back to Margaret. Greg and Mary gave Margaret a warranty deed, duly recorded on June 27, 1990.

Margaret then sought to assume the mortgage loan, submitting a financial statement to the Bank. The Bank instead elected to accelerate the mortgage loan, which contained a due-on-sale clause, because the Property had been conveyed to Margaret. On September 10, 1990, Schwanke wrote to Greg and Mary indicating that the mortgage loan was more than 60 days past due. Seven days later, the Bank's attorneys prepared a Notice of Mortgage Foreclosure Sale scheduled for November 14, 1990.

On October 26, 1990, Margaret brought this suit against the Bank. She alleged that Greg fraudulently induced her to transfer the Property, assuring her that a life estate had been reserved, and that the Bank was negligent in granting the loan to Greg and taking the mortgage. She sought judgment declaring the mortgage invalid and permanently enjoining the Bank from foreclosing against the Property. Margaret also sought an injunction against the foreclosure sale scheduled for November 14, 1990. The injunction was granted but Margaret was ordered to make all past due and future mortgage payments on the mortgage pending final judgment. She complied.

After discovery, Margaret moved to amend her complaint to include a claim for punitive damages. The Bank had persisted in claiming that the "closing" took place on March 21, 1990, yet Margaret knew that Mary left Minnesota on February 13, 1990 and did not sign the documents on March 21, 1990. The trial court granted the motion after Margaret provided evidence that Mary left Two Harbors in February 1990 and was not in Minnesota on March 21, 1990. The case soon went to trial before a jury.

After Margaret rested her case, the Bank moved for a directed verdict dismissing all counts. The motion was granted verbally, in chambers. During the motion hearing, the trial court stated there was no evidence of any willful action by the Bank against Margaret and that the Bank had reasonably relied on the recorded quit claim deed and on Greg's statements that his mother had his permission to live in the home. The trial court ruled that the Bank had no duty to investigate any further. Finally, the trial court held that because the quit claim deed contained no reservation of a life estate, the Bank did not breach any trust. No written findings, conclusions or memoranda were issued.

Judgment was entered in favor of the Bank, dismissing all of Margaret's claims.

In her motion for a new trial, Margaret argued that possession by a grantor after the deed to the grantee is notice of her rights. She argued that she had presented sufficient evidence in support of her punitive damages claim and that the directed verdict was inappropriate against the claim that the mortgage should be declared null and void. Margaret also requested the trial court stay entry of the judgment pending appeal; her motion was summarily denied. The trial court ordered that, pending appeal, the Bank would be restrained from proceeding with the foreclosure only if Margaret gave a security in the amount of $25,000. As a condition of any injunction, the court also ordered Margaret to make all past due and future mortgage payments pending appeal.

On December 4, 1991 the Bank issued a Notice of Foreclosure Sale scheduled for January 29, 1992. The notice of appeal was filed December 9, 1991. On December 31, 1991 Margaret moved this court for an injunction against the foreclosure, pending resolution of the appeal. On January 14, 1992, this court refused to stay the foreclosure without a bond but ordered this appeal expedited. After the briefs in this case were filed, Margaret moved to strike those portions of the Bank's brief and appendix which contain or relate to materials outside the record. On March 26, 1992, this court at special term ordered consideration of that motion deferred to the panel for decision with the merits of this appeal.

## ISSUE

Did the trial court err in granting a directed verdict in favor of the Bank?

## ANALYSIS

### Standard and Scope of Review

Margaret argues that the trial court erred in directing a verdict in favor of the Bank because she presented sufficient evidence in support of her claims. A motion for a directed verdict may be made at the close of the evidence offered by an opponent. Minn.R.Civ.P. 50.01. If the evidence is sufficient to sustain a verdict for the opponent, the motion shall not be granted. *Id.* On appeal from a directed verdict, the reviewing court makes an independent assessment of its appropriateness. *Citizens Nat'l Bank of Willmar v. Taylor,* 368 N.W.2d 913, 917 (Minn.1985). A motion for a directed verdict presents a question of law for the trial court: whether the evidence is sufficient to present a fact question for the jury to decide. *Id.* A directed verdict should be granted only where, in light of the evidence as a whole, it would be the duty of the trial court to set aside a contrary verdict as manifestly contrary to the evidence or to the law. *Id.* Finally, in considering the motion, the trial court must accept as true the evidence favorable to the adverse party and all reasonable inferences which can be drawn from that evidence. *Id.* This court must apply the same standard. *Midland Nat'l Bank of Minneapolis v. Perranoski,* 299 N.W.2d 404, 409 (Minn.1980).

There were two issues to be decided in this case: whether the mortgage was invalid against Margaret's interests and whether the Bank's conduct in granting the mortgage loan would support an award of punitive damages.

### Validity of Mortgage

Margaret argues that the trial court erred in directing a verdict that the mortgage was valid. The trial court ruled verbally in chambers that the Bank was entitled merely to rely on the record title and had no duty to investigate any further. No further written opinion was issued. In granting the directed verdict, the trial court implicitly decided that the mortgages were valid as a matter of law and that, viewing the factual issues in the light most favorable to Margaret, a jury verdict in her favor would have been manifestly contrary to the evidence or to the law.

Minnesota law requires every conveyance of real estate to be recorded; unrecorded conveyances shall be void against any subsequent purchaser in good faith for valuable consideration. Minn. Stat. § 507.34 (1990). Under the recording

act, a purchaser in good faith is one who gives consideration without actual, implied or constructive notice of the inconsistent outstanding rights of others. *Miller v. Hennen*, 438 N.W.2d 366, 369 (Minn.1989). The purpose of the recording act is to protect those who purchase real estate in reliance upon the record. *Id.* "Implied notice has been found where one has 'actual knowledge of facts which would put one on further inquiry.'" *Id.* at 370 (quoting *Anderson v. Graham Inv. Co.*, 263 N.W.2d 382, 384–85 (Minn.1978)).

If one is aware that someone other than the vendor is living on the land, one has a duty to inquire concerning the rights of the inhabitant of the property and is chargeable with notice of all facts which such inquiry would disclose. *Id.* One is not a bona fide purchaser if one had knowledge of facts which ought to have put one on an inquiry that would have led to knowledge of a conveyance. *Id.*

A purchaser who has actual, implied or constructive notice of the outstanding rights of another is not a bona fide purchaser entitled to the protection of the recording act. *Miller*, 438 N.W.2d at 370. Actual, open possession and use of property puts a subsequent purchaser on inquiry notice of the possessor's rights in the property. *Id.* at n. 4; *Konantz v. Stein*, 283 Minn. 33, 42, 167 N.W.2d 1, 8 (1969); *Farmers State Bank of Eyota v. Cunningham*, 182 Minn. 244, 246, 234 N.W. 320, 321 (1931). Actual possession of real property is notice to all the world of the title and rights of the person so in possession and also of all facts connected therewith which reasonable inquiry would have developed. *Anderson*, 263 N.W.2d at 385. Implied notice differs from constructive notice arising from the *record* of instruments because the record is notice only of what appears upon its face. *Id.*

In Minnesota, clear, actual, exclusive possession of the granted premises by the grantor, even after delivery and recording of the deed, is notice against purchasers and mortgagees of the grantor's possible interest in the property. *See Teal v. Scandinavian–American Bank*, 114 Minn.

435, 441, 131 N.W. 486, 488 (1911). In that case, Teal deeded property to Johnson, but retained a repurchase right which was not recorded. Teal remained in possession of the property. Johnson executed a mortgage to borrow money from the bank. Johnson told the bank that he had bought the land but that Teal, the grantor, would remain in possession for the summer. Johnson later reconveyed the property to Teal and the bank began foreclosure proceedings. Teal sought injunctive relief and cancellation of the mortgages.

In deciding the case, the Minnesota Supreme Court noted that when the mortgages were given to the bank by Johnson, Teal was a grantor still in actual possession of the property and that this was notice to all the world of his rights. *Id.* at 441, 131 N.W. at 488 (citing, *inter alia, Groff v. State Bank*, 50 Minn. 234, 52 N.W. 651 (1892)). The court stated that the bank was expressly informed before the mortgage was executed that Teal was in possession and yet it made *no inquiry* concerning his rights, *relying wholly upon statements made by Johnson. Teal*, 114 Minn. at 441, 131 N.W. at 488. In order to have status as a bona fide purchaser the mortgagee's inquiry must be directed to the person in *possession;* inquiry of the mortgagor, who may have reason to conceal the truth, is not sufficient. The supreme court stated, "Having made no inquiry, [the bank] is chargeable with notice of the actual condition of the title to the land." *Id.* (citations omitted).

Schwanke testified that he never contacted Margaret, although he knew she was living on the Property. Schwanke also acted to ensure that only Greg would be contacted by the others involved. Schwanke knew the title opinion contained an exception for the rights of occupants but he ignored it as "boilerplate." The Bank argues that it satisfied its duty of inquiry by asking Greg what interest his mother had in the Property. We disagree. Greg told the Bank that his mother was simply living there with his permission. The Bank knowingly prevented and avoided

inquiry directed to Margaret. The evidence demonstrates that, had the Bank inquired of Margaret, it could have learned that she asserted a superior interest. The Bank is therefore chargeable with notice of Margaret's unrecorded interests.

The instant case is distinguishable from *Olson v. Olson*, 203 Minn. 199, 281 N.W. 367 (1938). That case involved a similar fraud with one important distinction: the father and son lived together in the property both before and after the deed from father to son. Because possession by the grantor was not exclusive, the supreme court held that the living arrangements were not such to put a third party on inquiry notice. *Id.* at 204, 281 N.W. at 368. In reaching its decision, the supreme court distinguished the holding of *Groff* upon which the court had relied in *Teal*. In *Groff*, the grantor remained in possession, with a reserved but unrecorded interest, after giving a deed to another. The supreme court held that possession of the granted premises by the grantor after delivery of his deed is as much notice of the interest of the occupant as possession by a stranger to the record title. *Id.*, 50 Minn. at 238, 52 N.W. at 652. In the present case, Greg lived in his own home both before and after obtaining his mother's deed. Her continued possession was as effectual as notice of her rights as possession by a stranger would have been. *Olson* is distinguishable on its facts; the rule of *Groff* and *Teal* governs this case.

The fact that Margaret was a grantor-in-possession gave rise to a duty that the Bank inquire of *her* as to her rights. The trial court in this case considered *Groff, Olson* and *Teal*, but erred in deciding that the Bank had no duty to investigate beyond the state of the record title. The Bank had a duty to inquire of Margaret and is charged with notice of all facts which such inquiry would have disclosed; thus, it is not a bona fide purchaser in good faith for value without notice. *Miller*, 438 N.W.2d at 370.

### Directed Verdict

In granting the directed verdict, the trial court also decided as a matter of law that the evidence was insufficient to support a verdict in favor of Margaret. The trial court should have viewed, and this court must view, as true all evidence in favor of Margaret, including any inferences which can be reasonably drawn from the facts presented. *Citizen's Bank*, 368 N.W.2d at 917; *Midland National Bank*, 299 N.W.2d at 409.

Margaret testified that her son fraudulently induced her to transfer the Property and that they had an unrecorded agreement, the Note reserving her a life estate, which she believed was "official" because it was notarized.

Mary testified that Greg told her he was getting a mortgage loan to pay off all the bills, including their debt to her parents. She testified that the loan application was incomplete when she signed it. She said that Schwanke came to their house with the mortgage documents soon after she signed the loan application, and that she did not read the documents but simply signed them. She said she did not know Greg had obtained any interest in the Property and that she was permitted to assume that it was her own house against which the mortgage loan was being made.

At trial Greg invoked his fifth amendment right not to give self-incriminating testimony. The record reveals that felony fraud charges were filed against him. Greg testified through an earlier deposition that he thought the Note "took care of" giving his mother a life estate. He admitted that his wife assumed that it was their own residence he was mortgaging and that she did not know about his interest in the Property. He stated that he did not tell his mother about the mortgage, but that she had told him not to mortgage the Property. Greg stated that his mother was unaware of the Bank's appraisal; he had a key and arranged it for a time when his mother was at work.

Schwanke admitted that the loan application, which was supposed to list real estate owned by the borrower, never included the Property. He admitted that the 'closing' actually occurred on February 9, 1990. He admitted that he had previously testified

the closing had taken place on March 21, 1990, had notarized the documents to so indicate, and that he was now also changing his testimony about who drafted the documents. He alleged that he requested the Bank's attorney prepare loan documents different from those in evidence. The documents requested, however, were the same as those used in this transaction. One reasonable inference is that the incomplete documents signed by Mary were later completed by Schwanke, who referred to the documents prepared by the Bank's attorney. Schwanke also admitted that Greg brought in the loan application signed, but incomplete, and that he helped Greg complete it.

Schwanke's credibility was impeached by earlier inconsistent sworn testimony. A reasonable inference from this evidence is that the Bank acted in concert with Greg to conceal from Mary, the co-borrower, that Greg had title to the Property, and to conceal that Mary signed incomplete mortgage documents before a title opinion or appraisal was prepared. Schwanke's instructions to the appraiser to contact only Greg concealed Greg's scheme from both his mother and his wife. Schwanke's instructions to the Bank's attorney suggest that Schwanke attempted to create the impression that the closing took place on March 21, 1990, in the normal course of business; he engaged in conduct designed to conceal the facts.

Margaret also presented an expert banking witness who testified that it was not customary banking practice to grant a mortgage loan such as this one. The expert cited factors including Greg's substantial unsecured credit, omissions on the loan application, the commission-only source of income, and the discrepancy between claimed and actual income. He testified that in his opinion it was a deviation from the Bank's written loan policy to have granted the loan. He testified that the unencumbered ownership of the Property was very inconsistent with the credit card debt; that a lender would need to inquire about acquisition of the asset, how the debt got so high, and how the debt was serviced. He testified that the circumstances of obtaining the Property free and clear, having the grantor still reside there and then immediately seeking a mortgage loan are suspect.

In summary, most of the evidence presented clearly supports Margaret's claims; contrary evidence was generally impeached. Schwanke admitted that he had Mary pre-sign documents which were not complete, which were completed and notarized much later, and that he had previously made false statements about that. Schwanke admitted that he ignored the title opinion exception regarding the rights of occupants. He admitted that he inquired only of Greg regarding Margaret's possible rights in the Property. Greg admitted that he and his mother had intended to create a life estate. We must accept that evidence as true, including the reasonable inferences which may be drawn therefrom. *Citizens Bank,* 368 N.W.2d at 917; *Midland National Bank,* 299 N.W.2d at 409.

*Punitive Damages*

■ In addition to her claim that the mortgage is invalid against her interests, Margaret sought punitive damages based on the Bank's conduct in taking the mortgage. The level of conduct required to establish punitive damages is governed by Minn.Stat. § 549.20 which provides in pertinent part:

Subdivision 1. Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Subd. 2. Punitive damages can properly be awarded against a master or principal because of an act done by an agent only if:

\* \* \* \* \* \*

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

Subd. 3. Any award of punitive damages shall be measured by those factors

which justly bear upon the purpose of punitive damages, including * * * the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, * * * the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, * * *.

Minn.Stat. § 549.20 (1988). This statute was revised in 1990 to require a deliberate disregard for the rights of others. 1990 Minn.Laws ch. 555, § 15. This change was effective May 4, 1990 and applies to causes of action arising after that date. 1990 Minn.Laws ch. 555, § 24.

The evidence establishes that the Bank was more than disinterested in Margaret's rights. The Bank, through Schwanke, not only avoided but actually prevented inquiry directed to Margaret. These acts effectively prevented her from learning that the Bank planned to grant Greg a mortgage loan against the Property. This cause of action arose when the mortgage became an encumbrance against the Property in March of 1990. Therefore, while the Bank's conduct may demonstrate deliberate disregard for Margaret's rights, the standard applicable here is that of willful indifference. We hold that Margaret presented sufficient evidence to support a verdict that the Bank acted with willful indifference to her rights.

*Motion to Strike*

The Bank's appellate brief contains excerpts of a deposition which is not a portion of the transcript and was neither admitted into evidence nor filed with the trial court. These materials are not part of the record on appeal. Minn.R.Civ.App.P. 110.01. The motion to strike these materials is granted. All argument based on these extra-record materials is disregarded.

## DECISION

The trial court erred in granting a directed verdict in favor of respondent Commer-

cial State Bank of Two Harbors. The evidence, viewed in the light most favorable to Margaret Claflin, supports her claims. The trial court erred in holding that, as a matter of law, the Bank had no duty to inquire of Margaret Claflin although it knew that she was in possession of the premises. The evidence establishes sufficient willful indifference to support a claim for punitive damages. The motion to strike those portions of respondent's brief and appendix which relate to materials outside the record on appeal is granted in its entirety.

Reversed.