John GUSTAFSON, Appellant,

v.

Jack CHESTNUT, et al., Respondents.

No. C0–93–869.

Court of Appeals of Minnesota.

April 19, 1994.

Benjamin S. Houge, Coughlin & Houge, Ltd., Minneapolis, for appellant.

Kay Nord Hunt, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for respondents.

Considered and decided by ANDERSON, C.J., and LANSING and MULALLY,* JJ.

## OPINION

ANDERSON, Chief Judge.

Appellant John H. Gustafson sued respondents Jack Chestnut, Alan Demmer, and their law firm, respondent Chestnut & Brooks, for legal malpractice, breach of fiduciary duty, fraud and misrepresentation. The trial court directed a verdict in favor of respondents, concluding that respondents' alleged malpractice was not the cause of Gustafson's damages. We affirm.

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-    pointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

John Gustafson was an equal partner with Eugene LaVaque in a two-person partnership, known as Galaxy Associates (Galaxy). Galaxy's only significant asset was the Galaxy Building located in downtown Minneapolis. Travelers Insurance Company (Travelers) held a first and second mortgage on the Galaxy Building property, totalling $12.8 million. Each of the Travelers mortgages had a "due on sale" clause, which provided that Travelers must consent to the property's sale or the unpaid indebtedness would become due. Homeowners Federal Savings & Loan Association held a third mortgage on the building.

In the fall of 1985, Galaxy started trying to sell the Galaxy Building. Gustafson and LaVaque contacted Jack Chestnut, an attorney with Chestnut & Brooks, to determine if he was interested in buying the Galaxy Building or in becoming a partner with them. Chestnut rejected both options, but did agree to try to locate a buyer for the building. At about the same time, LaVaque approached Chestnut with the idea of forming a real estate brokerage firm. In late December 1985, LaVaque and Chestnut, along with Faye Larson, a key employee of Galaxy, became partners in a real estate business called Realty Forces, Inc. Gustafson knew that LaVaque and Chestnut were partners in Realty Forces, but states he was not aware of Larson's involvement.

In December 1985, Chestnut learned that Kroh Brothers Development Company of Kansas City was interested in acquiring property in Minneapolis. On December 27, Chestnut, on behalf of Realty Forces, registered Kroh Brothers with Galaxy as a potential buyer for the Galaxy Building. Earlier, on December 19, 1985, William Reiling of Towle Real Estate was registered as a potential purchaser of the building. Both Reiling and Kroh Brothers were aware they were in a strong bargaining position because of financial pressures on Galaxy to sell the building. Galaxy exchanged offers and counteroffers with Reiling and Kroh Brothers during December 1985 and January 1986.

On January 22, 1986, Reiling submitted a letter of intent to purchase the Galaxy Building. The letter of intent provided for: (a) a purchase price ranging from $16.3 million to $17.5 million dependent upon securing specific leases; (b) Reiling's ability to assume the existing debt without a fee and place a subordinate mortgage on the property; and (c) a closing date of May 14, 1986. If Galaxy failed to sign the letter of intent within 24 hours, the offer was void.

The same day, Gustafson, LaVaque and Chestnut met with Kroh Brothers in Kansas City and negotiated a purchase agreement providing for (a) a base purchase price of $17.3 million with increases to $18.1 million if certain leases were secured; (b) a due on sale clause waiver from Travelers permitting the property to be encumbered by subordinate financing; and (c) a closing date of April 30, 1986.

Chestnut testified that he told LaVaque and Gustafson to have independent counsel review the agreement and that he stood to earn a fee if Kroh Brothers purchased the building. The two partners wanted Chestnut to review the agreement with them, without independent counsel, which Chestnut did. Chestnut specifically stated that the contingency that Travelers accept refinancing "provided too much escape for Kroh," but Kroh refused to renegotiate this provision. Gustafson testified he understood that the financing contingency provided an "out" for Kroh. Gustafson admits that Chestnut made no recommendation about which proposal the partners should accept. On January 23, 1986, Galaxy signed the Kroh Brothers' purchase agreement.

On April 15, Travelers notified Galaxy and Chestnut that it would not provide written consent to the sale to Kroh Brothers. A week later, after learning of Travelers' refusal to consent to the sale, Kroh Brothers notified both Chestnut and Galaxy that it was terminating the January 1986 purchase agreement pursuant to its rights under the agreement. On May 14, the Galaxy Building was placed in receivership. At this point, Reiling and Galaxy began new negotiations, ending in June 1986 with Reiling signing a purchase agreement for $15,150,000 to buy the Galaxy Building. The parties closed on September 9, 1986.

A year later, Gustafson sued Chestnut, Alan Demmer and Chestnut & Brooks for legal malpractice, breach of fiduciary duty, fraud and misrepresentation. The trial court directed a verdict in favor of respondents. Pursuant to the parties' stipulation, the only issue on appeal is whether the court properly directed a verdict on Gustafson's legal malpractice claim.

## ISSUE

Did the trial court err by directing a verdict in respondents' favor on appellant's legal malpractice claim?

## ANALYSIS

A directed verdict motion presents a question of law for the trial court to determine whether the evidence is sufficient to present a fact question for the jury. *Citizen's Nat'l Bank v. Taylor*, 368 N.W.2d 913, 917 (Minn.1985). A court should only direct a verdict if, in light of the evidence as a whole, the court would have the duty to set aside a contrary verdict as manifestly contrary to the evidence or to the law. *Id.* In making this determination, the court must accept as true the evidence favorable to the adverse party and draw all reasonable inferences from that evidence. *Id.* On appeal from a directed verdict, we apply the same standard and make an independent assessment of the propriety of the trial court's ruling. *Claflin v. Commercial State Bank*, 487 N.W.2d 242, 247 (Minn.App.1992), *pet. for rev. denied* (Minn. Aug. 4, 1992).

When a legal malpractice claim does not involve the loss of an underlying claim, the plaintiff must show:

(1) the existence of an attorney-client relationship giving rise to a duty; (2) the negligent giving of advice or exercise of judgment on which the client detrimentally relies; and (3) the negligent advice or judgment must be the proximate cause of the damage to the client.

*Fiedler v. Adams*, 466 N.W.2d 39, 42 (Minn. App.1991) (citations omitted), *pet. for rev. denied* (Minn. April 29, 1991). Causation is usually a fact issue for the jury, *Vanderweyst v. Langford*, 303 Minn. 575, 576, 228 N.W.2d 271, 272 (1975), but may be decided as a matter of law when reasonable minds can arrive at only one conclusion. *Lennon v. Pieper*, 411 N.W.2d 225, 228 (Minn.App. 1987).

For the purpose of reviewing the directed verdict, we, like the trial court, presume the following to be true: (a) Chestnut had an attorney/client relationship with Galaxy; (b) he had a conflict of interest with Galaxy; and (c) he "should have declined" to represent Galaxy. We are thus faced with the issue of whether there was sufficient evidence that Chestnut's conflict of interest was the cause of Galaxy's injuries. We hold the trial court properly directed the verdict because Gustafson provided insufficient evidence of a disputed fact as to causation.

Gustafson argues that the trial court employed the improper standard for determining causation. We disagree. Malpractice claims involving loss of a client's existing cause of action require proof that, but for the attorney's negligence, the client "had a meritorious cause of action originally." *Fiedler*, 466 N.W.2d at 42 (quoting *Hill v. Okay Constr. Co.*, 312 Minn. 324, 338, 252 N.W.2d 107, 117 (1977)). In *Fiedler*, this court concluded that the plaintiff does not need to prove this so-called "case-within-a-case" element when no underlying cause of action was lost. *Id.* Gustafson argues that *Fiedler* eliminates the "but for" or substantial factor test as an element in malpractice actions. We disagree. *Fiedler* is simply an application, in a different fact situation, of the traditional rule of "but for" causation. *See Yusefzadeh v. Ross*, 932 F.2d 1262, 1264 n. 4 (8th Cir.1991). Accordingly, the trial court properly inquired into whether Chestnut's conduct was a substantial factor in bringing about Gustafson's alleged injuries.

Gustafson alleges that his injury arose from Chestnut's failure to adequately warn him about the "financing contingency" and the fact that the January agreement was subject to Kroh Brothers' approval of existing leases. These oversights, according to Gustafson, caused Kroh Brothers to decide not to purchase the Galaxy Building, led to the delay in selling the Galaxy Building, and ultimately decreased the building's purchase

price. In other words, Gustafson contends that, but for Chestnut's oversights, Galaxy would not have approved Kroh Brothers' purchase of the Galaxy Building and instead would have sold the building to Reiling in January 1986.

There are two defects in Gustafson's argument. First, both Kroh Brothers' purchase agreement and Reiling's letter of intent required that Travelers waive the due on sale clause, thereby making both proposals contingent on Travelers' approval of sale of Galaxy Building. Gustafson, however, provides no evidence whatsoever that Travelers would have waived the due on sale clause were Reiling the buyer in January 1986 instead of Kroh Brothers.[1] Consequently, even if Chestnut were negligent in representing Galaxy, no evidence was provided that showed such representation was the cause of Gustafson's alleged damages.

Second, there is no evidence that Chestnut advised Galaxy about which proposal—Kroh Brothers' or Reiling's—was the most preferable; he only advised Galaxy on the terms of Kroh Brothers' purchase agreement. Under these circumstances, the jury could only speculate whether another attorney would have advised Galaxy differently and whether, but for Chestnut's advice, Galaxy would have taken a different course of action. *See Fiedler*, 466 N.W.2d at 43 (causation is a jury issue where experts testify attorney's conduct was below standard of care and attorney failed to inform client of viable alternatives). Accordingly, Gustafson failed to provide evidence that Chestnut led him into accepting the Kroh Brothers' agreement, leaving Galaxy in a worse position.

Gustafson also argues that the directed verdict was based upon an erroneous presumption by the trial court that Chestnut had advised Gustafson that the Kroh Brothers' purchase agreement was "unenforceable." We disagree. During this litigation, the word "unenforceable" was used very loosely. When the trial court used the word "unenforceable" in granting the directed verdict, it used a connotation, which, in effect, meant the purchase agreement was an option contract providing Kroh Brothers with a "substantial" out.[2] The trial court did not err by basing its decision on this conclusion because Gustafson himself testified he was aware that both the Reiling letter of intent and the Kroh Brothers' purchase agreement had a number of conditions precedent, or "outs," such as the due on sale clause waiver.

## DECISION

The trial court properly directed the verdict in respondents' favor.

**Affirmed.**

---

1. The trial court pointed out:

   No witness was called by [Gustafson] from Travelers to prove that Travelers would have waived the pre-payment to anyone, or they would have permitted anyone to assume their financing. And it seems to me that that's one critical element that's missing from [Gustafson's] case. * * * There is no evidence that Travelers had any problems with Kroh that they wouldn't have had also with [Reiling]. There is no evidence that Travelers rejected [Kroh Brothers] for any reason or any advances from Kroh or any proposals from Kroh that would have been different from what [Reiling] would have proposed.

2. The trial court stated:

   It seems to me that what the Kroh purchase agreement and the [Reiling] letter of intent contain [are] substantial outs for the buyer, and so they were very similar, and similarly "unenforceable" as that term has been used during the course of this trial to date. To that extent, it seems to me they both similarly amount to options.