ARNOLD, Circuit Judge.
 

 This is an action for legal malpractice. The plaintiffs are Bahram Yusefzadeh and
 
 *1259
 
 his wife, Laury Yusefzadeh. The defendants are Burton G. Ross, a Minnesota lawyer, and his law firm, Ross, Faulken & Rosenblatt, Limited. Yusefzadeh hired Ross and his law firm to help him raise money to buy control of NuComp Systems, Inc., a company in the business of providing computer software to banks. At the time, Yusefzadeh was president and chief executive officer of NuComp, and owned about eight per cent, of the stock. The District Court
 
 [1]
 
 granted summary judgment for the defendants. It held that Yu-sefzadeh had failed to produce evidence creating genuine issues of material fact as to whether any of Ross's actions had been the proximate cause of any financial loss on Yusefzadeh’s part. We affirm.
 

 We briefly summarize the important facts, drawing mainly on an opinion of the District Court filed on July 25, 1989, granting partial summary judgment for defendants. This opinion is both detailed and clear, a rare combination, and has been of great help to us in focusing on the disposi-tive issues on this appeal. Most of the facts stated are not in dispute.
 

 In 1984, NuComp’s board of directors decided to sell the company. Yusefzadeh wanted to buy it. He hired Ross to act as his lawyer in accomplishing this purpose. Yusefzadeh got in touch with various possible sources of financing. One such source was Bruce Anderson, a New York venture capitalist and a partner in Welsh, Carson, Anderson & Stowe IV (WCAS IV), a venture capital fund. Yusefzadeh met with Anderson in January of 1985, but was not interested in dealing further with Anderson at that time. Another venture capital fund, New Trends, Inc., from Chicago, also expressed interest, but decided against buying NuComp. Then, in late March or early April, NuComp’s board gave Yusefza-deh 30 days within which to obtain financing to purchase NuComp himself. Failing this, the board intended to proceed with plans of its own.
 

 ' At this point, in April of 1985, Anderson and his venture capital fund, WCAS IV, re-entered the picture.
 
 [2]
 
 Yusefzadeh called Anderson, told him about the 30-day opportunity, and asked if he was still interested. Anderson was interested, and Ross, acting for Yusefzadeh, proceeded to negotiate with Anderson and his group. On May 6, 1985, the board of NuComp agreed with Anderson on a cash purchase of the company for $3,800,000. Anderson and WCAS IV would buy 50 per cent, of the stock for $1,000,000, Yusefzadeh and a group to be assembled by him would do likewise, and the remainder of the financing would come in the form of a loan from WCAS IV.
 

 Acting on the basis of this agreement, Yusefzadeh continued his efforts to raise money in the market. An investor group called the 530 Fund turned him down. So did Norwest Bank. At length, by June 3, 1985, Yusefzadeh had assembled a group of about five investors, including a group of NuComp employees, agreeing to contribute a total of $895,000, substantially less than the $1,000,000 to which Yusefzadeh was committed. Negotiations with WCAS IV, conducted by Ross on behalf of Yusef-zadeh, continued. On June 7, 1985, the deal was closed. The resulting stock ownership in NC Systems, a new corporation formed to operate the business, was as follows: WCAS IV, 1,000,000 shares, Yu-sefzadeh, 421,000 shares, Ross, 37,037 shares, and others, 361,000 shares. WCAS IV and Ross invested an additional $1,763,-000 in the form of debt.
 
 [3]
 

 
 *1260
 
 Yusefzadeh’s main damage theory is this: if Ross had acted with due care and in accordance with all ethical precepts, he would have advised Yusefzadeh to look elsewhere for financing, once it began to appear that the deal taking shape with Anderson and WCAS IV was going to be significantly less favorable to Yusefzadeh than he had expected. Had such advice been given, Yusefzadeh would have secured financing elsewhere, would have ended up as the owner of all the equity in the company, and would have had a secure, long-term employment contract. A number of unfavorable aspects of the deal that was actually consummated, the argument runs, would have been avoided. Yusefzadeh would not have had to give up $95,000 in bonuses that he claimed NuComp owed him from the previous year, he would have been granted a stock option covering 20,-000 shares at a price of $1.00 a share, rather than $2.00, he would have received an advantageous agreement covering redemption of his stock in the event of his discharge or a corporate restructuring, and he would have been given a secure employment contract. All of these consequences, Yusefzadeh claims, would have been avoided, because he would have obtained other financing, leading to a deal unmarred by these unfavorable aspects.
 

 The question presented, then, in the context of this summary-judgment proceeding, is whether Yusefzadeh’s evidence, when considered in a favorable light and given the benefit of all reasonable inferences, was sufficient to create a genuine issue of material fact on the question of causation. The issue comes down in the end to this: Would Yusefzadeh, but for the claimed tortious conduct of Ross and his law firm, have obtained financing from another source? We say “but for” advisedly. That is clearly the standard under Minnesota law in legal-malpractice cases. In order to succeed, a plaintiff must show not only violation by a lawyer of professional standards of due care and ethical conduct, but also that, but for this violation, some distinct advantage would have been obtained by the plaintiff-client.
 
 E.g., Blue Water Corp. v. O’Toole,
 
 336 N.W.2d 279 (Minn.1983);
 
 Raske v. Gavin,
 
 438 N.W.2d 704 (Minn.App.1989),
 
 petition for review denied
 
 (Minn. June 21, 1989). Although the parties cite many cases, both from Minnesota and elsewhere, on the point, we are left in no real doubt about the appropriate legal standard. It is the “but for” standard urged by defendants.
 
 [4]
 

 The question turns on documents that the parties have referred to as the “Spinner affidavits.” These affidavits are sworn statements of G. James Spinner, president of a venture capital firm in Minnesota called Summit Investment Corporation. One of the affidavits was filed after judgment in the court below, and this circumstance would normally disqualify it for present purposes, but defendants have not urged such a proposition, and we therefore consider the case as if both of the affidavits were properly before us for purposes of defendants’ motion for summary judgment. The first affidavit states, in pertinent part, that Summit would have financed the transaction for Yusefzadeh by offering an issue of debt to “accredited investors.” The District Court thought this reference too vague. It granted defendants’ motion for summary judgment on the ground that the Spinner affidavit did not name these “accredited investors.” In our view, this was too strict a standard. Affidavits submitted in connection with mo
 
 *1261
 
 tions for summary judgment need not anticipate every detail that might be questioned on cross-examination of the affiant. If Spinner had testified at a trial, and had mentioned “accredited investors” as the ultimate source of funds for debt financing, it would have been appropriate, on cross-examination, to ask him the names of the investors, and, if he could not supply a satisfactory answer, the trier of fact, judge or jury as the case might be, could well choose to discredit his evidence. We do not think, though, that the failure to name the investors on direct examination would have made a motion for directed verdict well grounded. The same standard applies in the summary-judgment context. The inquiry is whether, if plaintiffs case in chief at a jury trial should conclude with no more evidence than that proffered in opposition to the summary-judgment motion, a motion for directed verdict would have been well taken.
 

 We nevertheless agree with the result reached by the District Court. At this point it is important to recall that Yusefza-deh was working against a 30-day deadline. Further, he was not in control of the process. NuComp’s board of directors, negotiating on behalf of all of the company’s shareholders, would ultimately have a decisive influence on what deal to accept. Yu-sefzadeh owned only eight per cent, of the stock. The board, though not required to do so, had given him 30 days to secure financing of his own, financing that would have resulted in his owning all of the company. This 30-day period apparently expired sometime in early May 1985. At that point, Yusefzadeh had unsuccessfully sought financing from three institutional sources: New Trends, Inc., the 530 Fund, and Norwest Bank. All of these institutions had turned him down. Additionally, as later events proved, he was not able to raise even the $1,000,000 he had committed to as part of the agreement, by that time tentatively made, between NuComp and WCAS IV.
 

 If we assume for present purposes that Yusefzadeh would, if properly alerted by Ross, have found Summit and applied to it for financing, an important question is still unanswered: Would Summit have been able to act before the May deadline? Ap-pellees’ brief in this Court hammers this point home, and the reply brief contains no answer to it. Nor can we think of one. The issue here is not abstract. The question is not whether the “market,” considered as some hypothetical economic mechanism, would have thought the deal worth enough to finance it for Yusefzadeh. The issue is whether Yusefzadeh would actually have obtained financing, on time, but for Ross’s alleged defaults. On this subject neither Spinner affidavit has a word to say. This is a fatal defect in the proof, and we hold, therefore, that defendants’ motion for summary judgment was properly granted by the District Court.
 

 We have carefully considered Yusefza-deh’s remaining arguments in the context of the whole record, and hold that they are without merit. Accordingly, the judgment of the District Court is
 

 Affirmed.
 

 [1]
 

 . The Hon. David S. Doty, United States District Judge for the District of Minnesota.
 

 [2]
 

 . Anderson, WCAS IV, and others were originally joined as defendants. The issues on this appeal pertain only to Ross and his law firm.
 

 [3]
 

 . Ross's appearance as a principal, investing on his own behalf in both equity and debt, is the basis for one of Yusefzadeh’s theories of professional misconduct against him. It was improper, Yusefzadeh claims, for Ross to act on his own behalf at the same time as he was representing Yusefzadeh, and Yusefzadeh, as client, had not given full consent to this conflict of interest. Like the District Court, we assume, with respect to this claim of misconduct as well as the others asserted by the complaint, that there are genuine issues of fact on the question of liability. The present appeal is concerned only with the question of proximate causation of loss to Yusefzadeh.
 

 [4]
 

 . We note the decision of the Minnesota Court of Appeals in
 
 Fiedler v. Adams,
 
 466 N.W.2d 39 (Minn.App.1991),
 
 petition for review denied,
 
 (Minn. April 29, 1991). Plaintiff makes much of the decision, claiming that it helps his case on the issue of causation. We read
 
 Fiedler,
 
 however, as nothing more than another application, in a different fact situation, of the traditional rule of proximate cause. The Court of Appeals’ opinion, for example, referring to affidavits filed in opposition to defendants’ motion for summary judgment, states that ”[i]n the opinion of the experts, a competent attorney would have informed the Fiedlers of [certain financing] alternatives and advised them which method would reduce their debt load at the lowest cost.” 466 N.W.2d at 43. We think this is simply an application of the traditional rule of but-for causation. As in
 
 Fiedler,
 
 our inquiry is whether a competent attorney would have led the client to alternative sources of financing.