**In re SENIOR COTTAGES OF AMERICA, LLC, Debtor.**

Timothy D. Moratzka, Trustee of the Bankruptcy Estates of Senior Cottages of America, LLC and Senior Cottage Management, LLC, Plaintiff,

v.

Richard Morris, Morris, Carlson, Hoelscher, P.A., and Michael Cohen, Defendants.

Bankruptcy No. 00–32012.
Adversary No. 03–3132.

United States Bankruptcy Court, D. Minnesota.

Sept. 27, 2010.

Andrew    Paul    Moratzka,    Mackall
Crounse & Moore, Minneapolis, MN, for
Plaintiff.

Timothy D. Moratzka, Minneapolis, MN, pro se.

Charles E. Lundberg, David A. Turner, JoAnn Grady, Margaret E. Noubissie, Mary Bordian, Bassford Remele, A Professional Association, Minneapolis, MN, Thomas F. Miller, Thomas F. Miller, P.A., Wayzata, MN, for Defendants.

## ORDER GRANTING MOTION OF DEFENDANTS RICHARD MORRIS AND MORRIS, CARLSON, HOELSCHER, P.A. FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came before the Court on the motion of Defendants Richard Morris and Morris, Carlson, Hoelscher, P.A. ("the Morris Defendants") for summary judgment. The Morris Defendants appeared by their attorney, Charles E. Lundberg. The Plaintiff appeared by his attorney, Shane H. Anderson. This order memorializes the disposition of the motion.

### INTRODUCTION

This adversary proceeding was commenced by the trustee in bankruptcy for a group of related business entities.[1]

The bankruptcy estates for two of those debtors—Senior Cottages of America, LLC and Senior Cottage Management, LLC—are the parties-plaintiff. (Collectively, the two companies will be termed "Senior Cottages" or "the Debtors."[2]) The Morris Defendants are an individual attorney who represented and counseled the Debtors before their bankruptcy filings, and his law firm. The action against these professionals sounds in tort—for negligence (legal malpractice) and for aiding and abetting a breach of fiduciary duty. The fiduciary-principal is identified as Murray Klane, the person alleged to have been in "complete control of" the Debtors at the relevant times. The Plaintiff has standing to bring this action, as successor to the Debtors by operation of 11 U.S.C. § 541(a).

On motion of the Morris Defendants, this Court dismissed this lawsuit for the Plaintiff's failure to state a claim on which relief could be granted. *In re Senior Cottages of America, LLC,* 320 B.R. 895 (Bankr.D.Minn.2005).[3] The Plaintiff took an appeal from a subsequent order in which his motion to amend his complaint was denied. Ultimately, the Eighth Circuit Court of Appeals reversed and remanded. *In re Senior Cottages of America, LLC,* 482 F.3d 997 (8th Cir.2007). After a grant of leave to the Plaintiff to further amend his complaint, plus a twice-extended discovery period, the Morris Defendants moved for summary judgment. This motion is the matter at bar.

### PLAINTIFF'S THEORY OF SUIT

The Plaintiff, of course, had to base his theories of suit on specific allegations of fact. The way in which his attorneys

---

1. The companies originally filed under Chapter 11, and their cases were converted later to ones under Chapter 7.

2. During the litigation of this matter, counsel have not made any distinction between the two entities, often referring to them in the collective. This decision will follow that practice, for purposes of reference but in terms of reference alone.

3. Per the Plaintiff's original complaint, Defendant Michael Cohen had been in-house counsel for Senior Cottages at the relevant times. In mid–2005, the Court entered default judgment against him, on a stipulation between him and the Plaintiff. All further references to parties-defendant will signify the two remaining ones.

pleaded those facts led to much confusion, and a lengthy and involved appellate process. On remand, the Court allowed a repleading that was deemed the final fact assertion on which the litigation would go forward. That process got entirely too fussy, and the Plaintiff's last pleading is still more terse than it could have been. Thus, the facts in question are now most accurately summarized with references to the Eighth Circuit's opinion (which summarizes the Plaintiff's amended complaint), plus the second amended complaint (the last version of the Plaintiff's pleading). For the most part, there is no material difference between these documents' recitation of the basic, historical facts.

The Plaintiff alleges the following: Senior Cottages was "in the business of developing, building, and managing senior citizen housing projects, which qualified for low income housing tax credits." 482 F.3d at 999; Second Amended Complaint, ¶ 10. One Murray Klane was "in complete control of the daily operations" of both of the Debtors. Second Amended Complaint, ¶ 12. Klane owned a "60% interest" in Senior Cottages. 482 F.3d at 999; Second Amended Complaint, ¶ 26. "In 1998, Senior Cottages was insolvent, in that it was not paying debts as they became due"; so, it "needed to sell its valuable assets (the housing projects)—presumably, to an entity that could benefit from the tax credits." 482 F.3d at 999–1000; Second Amended Complaint, ¶ 15. Then,

> [r]ather than finding an arm's-length buyer, Klane formed a new entity, Millennium Properties, LLC, in August, 1998, and caused Senior Cottages to transfer all or substantially all of the assets of Senior Cottages to Millennium, including eleven housing projects. In return for the assets, Millennium assumed debt secured by the assets, but did not pay anything.

. . .

> The amended complaint alleges that the value of the projects was at least $4.8 million. Additionally, Klane directed cash payments to Millennium which should have been made to Senior Cottages.

As to the Defendants here, the Plaintiff asserts,

> Morris and his law firm were outside counsel to Senior Cottages and also represented Klane. They advised Senior Cottages to transfer the assets to Millennium and substantially assisted the transaction. The amended complaint alleges that Morris knew that the transfer was for inadequate consideration, that Klane was breaching his fiduciary duties to Senior Cottages in making the transfer, and that the transfer damaged Senior Cottages in the amount of at least $4.8 million.

482 F.3d at 1000; Second Amended Complaint, ¶¶ 16, 18, 20, 27.

> The amended complaint alleged counts against Morris and his law firm for negligence and aiding and abetting Klane's breach of fiduciary duty [to Senior Cottages].

482 F.3d at 1000; Second Amended Complaint, ¶¶ 31–34, 36–43.

## THEORY OF THE DEFENSE

In their answer, the Morris Defendants admit several key points of fact: that they "have, at different times, provided certain limited legal services to [Senior] Cottages, Millennium [Properties, LLC], and/or Klane"; that Senior Cottages was insolvent in 1998; that Senior Cottages "transferred certain assets to Millennium [Properties, LLC] in consideration for the assumption of secured debt"; and that the Morris Defendants "were aware that Klane was a governor of Millennium

[Properties, LLC]." They deny the other facts pled by the Plaintiff.

On the offensive, they state that the Plaintiff "has not adequately pleaded a claim of any actual damage caused by anything that the Morris [D]efendants did or did not do, and [they] affirmatively allege that the [P]laintiff cannot show any damages." In summary fashion, they plead the affirmative defenses of assumption of the risk, comparative fault, estoppel, laches, and *in pari delicto.*

## MOTION AT BAR

After the remand from the Eighth Circuit through the District Court, the discovery process was structured by scheduling order, extended twice, and then closed. The Morris Defendants then filed the present motion for summary judgment on both counts of the Plaintiff's complaint. The motion is framed under Fed.R.Civ.P. 56(b).[4] The Plaintiff responded to the motion square-on; he did not make a demand for more discovery under the proviso of Fed.R.Civ.P. 56(f).[5]

Thus, the Defendants' motion must be analyzed within the thrust of Fed.R.Civ.P. 56(c)(2).[6] This rule requires a two-step inquiry: first, is there a genuine issue of material fact as to the claims under the two counts at issue? *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). And, if there is none such, are the Morris Defendants entitled to judgment on the two counts, as a matter of law, on the undisputed facts?

The defense propels this motion under the construction of Rule 56 that the United States Supreme Court adopted over two decades ago, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the parties have had adequate time for discovery, and a party-defendant believes that the evidentiary fruits of both sides' discovery and its own investigation do not make out a prima facie case for the plaintiff, it may move for summary judgment in its favor. It need only "point[ ] out ... that there is an absence of evidence to support the [plaintiff's] case," as to one or more of its essential elements. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548. If in its response to the motion the plaintiff does not produce admissible evidence to support findings on all of the elements of its prima facie case, the court must grant the motion—"since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548. *See,* in general, *In re Nation–Wide Exchange Servs., Inc.,* 291 B.R. 131, 138–

---

4. This rule provides:

 **By a Defending Party.** A party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or part of the claim.

 Fed. R. Bankr.P. 7056, which governs this adversary proceeding, incorporates the full content of Fed.R.Civ.P. 56 by reference. For brevity, all further references will be to the provisions of the civil rule alone.

5. This rule provides:

 **When Affidavits are Unavailable.** If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present

facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

6. The text of this rule is:

 The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

139 (Bankr.D.Minn.2003), and *In re Nor-thgate Computer Sys., Inc.*, 240 B.R. 328, 337–339 (Bankr.D.Minn.1999) (summarizing Eighth Circuit authority premised on *Celotex*).

The substantive law that governs the Plaintiff's causes of action comes into play at both stages in summary judgment analysis. First, the governing law determines which facts are material, for the purposes of determining whether the record demonstrates triable disputes of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. If there are none such, the governing law is then applied to the undisputed facts established by the evidentiary record presented. The court then is to determine whether the movant "is entitled to judgment as a matter of law," as Rule 56(c)(2) contemplates.

### ANALYSIS OF MOTION

### I. Count I: Negligence/Attorney Malpractice

■ To make out a claim of legal malpractice arising from professional services rendered in connection with a business transaction, the client-plaintiff must prove the following elements:

1. the existence of an attorney-client relationship;
2. acts committed by the attorney that constitute negligence or breach of contract;
3. proximate cause, as between the attorney's conduct and the injury to the client; and
4. but for the attorney's conduct, the client would have obtained a more favorable result in the transaction than the one actually obtained.

7. The double-emphasis is in the original. The quotations are from the Morris Defendants'

*Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 and 819 (Minn.2006).

■ In his original written submission for this motion, the Morris Defendants' counsel made a three-part attack on the Plaintiff's ability to prove a prima facie case under Count I. By the date of the hearing, he conceded the existence of triable fact disputes as to two of the elements (the existence of an attorney-client relationship and acts constituting negligence). As to Count I, then, the Morris Defendants presented this motion only on the causation and damage elements under *Jerry's Enters., Inc.;* to some extent they intertwined the two concepts under the rubric of "but-for causation." Their theory of fact, based upon the historical events and their own expert's testimony in deposition, is as follows:

1. In its own right, Senior Cottages and its whole business operation were "doomed to failure in August 1998" because "no income stream could have been generated out of the 11 housing projects" that it had on its books and in its operation, and that it then assigned to Millennium Properties; and, beyond that,

2. There was no other way of recovering value out of the properties and contract rights of Senior Cottages at the time, because *"no other developer or tax-credit buyer"* would have bought the projects on terms and conditions that would [have] result[ed] in [Senior Cottages] receiving any appreciable money." [7]

Thus, they argue, the Plaintiff can not prove an essential element of his case: that Senior Cottages "would have obtained a more favorable result," *Jerry's Enters.,*

motion, at 15–16.

*Inc.*, 711 N.W.2d at 819, absent the conduct of the Morris Defendants that preceded the wholesale transfer of assets to Millennium Properties. In this casting of the issue, the subject "transaction" is envisioned more broadly; it is the possible chain and range of reactive measures that would have been taken in consequence of Senior Cottages' mounting financial distress, rather than the one-time act that did take place, the divestment of assets in bulk. This is appropriate for malpractice analysis in a case where the insolvency of the client was the central problem for which the defendant-professional was engaged. *Christians v. Grant Thornton, LLP,* 733 N.W.2d 803, 812–813 (Minn.Ct. App.2007) (imposing burden on plaintiff in accountant-malpractice action "to introduce concrete evidence of what [corporation-client] would have done but for [accountant's alleged] negligence" in failing to recognize and report corporation's impending insolvency to corporation's board "and what those actions would have reasonably produced").[8]

The focus of the Plaintiff's malpractice claim is on the legal advice that Morris is alleged to have given to the Debtors in conversations with Klane, when Klane disclosed to Morris that Senior Cottages had run out of capital, had no financing available to it in its own right, had commenced construction on only two (perhaps three) of the eleven senior-citizen housing developments that it had parlayed to its investors, and was facing litigation by one of its former principals and members of his family. The Plaintiff's evidence would support a finding that Morris advised Klane that a wholesale transfer of all of the tangible and intangible assets of Senior Cottages to a new entity, in tandem with the new entity's "assumption" of the secured debt of Senior Cottages, would be a proper and legally-sustainable step toward salvaging the future of the development projects—as long as the transfer was not "for less than fair and adequate consideration" within the meaning of the law of fraudulent transfers.[9] The whole thrust of the Plaintiff's theory of suit is that this advice could not possibly have benefitted Senior Cottages, the ostensible client [10]—because the transfers left it saddled with the burden of all of its secured and unsecured debt, and no assets or operations at all.[11]

8. The wording in *Jerry's Enters., Inc.* makes a reference in the singular, to "the underlying transaction." However, *Christians v. Grant Thornton* clearly envisions the possibility of malpractice committed as to a client's global *situation,* and the variety of possible transactions or other acts that could be brought to bear on it on a professional's advice.

9. The record includes portions of transcripts of two depositions of Morris, and their texts could support a finding to this effect. *See* Deposition of Richard L. Morris (taken October 11, 2001 in *Moratzka v. Klane,* ADV 00–3284) ("Morris 2001 Depo."), Tr. at 64; Deposition of Richard Morris (taken July 17, 2008 in this adversary proceeding) ("Morris 2008 Depo."), Tr. at 44. It is not appropriate to make that finding now, and hence it is not made. The Morris Defendants concede that there is a genuine issue of material fact on the elements of attorney-client relationship and negligent acts (i.e., the content of advice given); so, the factual dimensions of these elements are not before the Court under this motion.

10. The Morris Defendants dispute that they ever undertook to represent the Debtors through any remarks that Morris made to Klane. Per note 9 *supra,* the issue of whether an attorney-client relationship existed is not before the Court under this motion.

11. Some observations on the entanglement of debt after the transfer are appropriate; the Eighth Circuit may have made certain assumptions about the nature of this point for its analysis, and more specificity on the historical facts might clarify the general character of the transfer. The record for this motion is uncontroverted: Morris and Klane never contemplated any action by which the Debt-

Thus, the Plaintiff maintains, the Debtors were left unable to complete the projects, to satisfy their creditors, and to maintain the tax-sheltered benefits to present and future investors in privity with it and its affiliates; and all this occurred through an action counseled by the attorney who was supposed to be representing the Debtors and furthering their interests.

For this motion, however, the defense brings it back around to the element of causality that the Plaintiff must also prove, specifically the "but-for" causality in relation to the actual outcome and possible alternatives that is required by *Jerry's Enters., Inc.* and *Christians v. Grant Thornton.*

The defense argues that Senior Cottages would have had no chance to survive, had it kept the projects' assets. Further, per the defense, the various projects themselves, as they had been previously structured to start the process of obtaining tax credits, were fatally flawed; and no new developer or investor would have purchased them or any component asset from the Debtors to carry on the operations themselves. Thus, as the defense would have it, without a viable option for the completion and long-term operation of its development projects, and with no chance of recovering net value from a liquidation of its assets, Senior Cottages would have been just as hobbled had it retained the assets. The point, more tersely, is that Senior Cottages was no worse off than it was before the act of divestment that Mor-

ris allegedly counseled. This argument, if borne out as a matter of fact, would defeat the Plaintiff's malpractice claim.

■ The Morris Defendants maintain that the record—the assembled fruits of discovery and investigation—could not possibly satisfy the causation element of the Plaintiff's case in chief. If they are correct, they are entitled to summary judgment; in a malpractice action, "proximate cause can be decided as a matter of law where reasonable minds can arrive at only one conclusion" on the evidence presented. *Raske v. Gavin,* 438 N.W.2d 704, 706 (Minn.Ct.App.1989). To get there, they make two different thrusts, based on separate items of evidence in the record.

The first is framed by the threshold pronouncement in *Celotex Corp. v. Catrett,* the other-directed "pointing" to the inadequacy of the opponent's evidence. The Morris Defendants argue that the Plaintiff's evidence is not even relevant to the specific point of fact that "but-for" causality requires: a possible future for Senior Cottages in which, *de facto,* it could have survived to fruition of its developments, solvent and steady, by retaining its assets, or in which it would have found a successor-developer willing to buy their assets for valuable consideration.

For their second thrust, they produce substantial evidence of their own on those very points: the deposition testimony of one Michael Saxton, a prospective witness, as an expert. The long-time principal of Cottage Homesteads of America, Inc., Sax-

ors would have been relieved of the legal liability of *any* debt, even the secured debt that the successor-entity was to "assume" via an agreement running between the Debtors and the successor entity alone and without any ratification or release from the secured creditors. (The present record also is undisputed that they fully contemplated no "assumption" of any of the Debtors' unsecured debt by the new entity, at all. The express

goal was to leave the successor entity unburdened by that component of the Debtors' debt structure.) Again, these observations are not memorialized as formal findings of fact and no findings are made as such; they just place the matter of the consideration for the transfer in a more accurate context. At the very least, the undisputed evidence on these points underlines the desperate character of the Debtors' straits at the time of the transfers.

ton is an experienced operator in the very industry endeavor in question. Saxton opined that in 1998 it would not have been possible for Senior Cottages to resuscitate its operations, or even to salvage any net value at all via the sale of its actual and nascent assets, had it retained those assets. He voiced this conclusion repeatedly over a lengthy interrogation by the Plaintiff's counsel. He bolstered his insistence with references back to his own successes in twenty years of developing low- and moderate-income housing with financing supported by tax credits, and some near-failures of his; his detailed backup analyses of the Debtors' capitalization, early operations, and financial projections; and the fundamental flaws in the Debtors' basic business plans.

Saxton observed that, in mid–1998, the Debtors were insolvent, i.e., that the value of their and their affiliates' assets and their various contractual and legal rights were less than the debt then owed by the Debtors.[12] The Debtors had started construction on only a minority fraction of the projects on their books.[13] There was no "equity value in the company," i.e., Senior Cottages.[14]

He was emphatic enough on that point. But more to the point of the Plaintiff's theory of suit, he insisted without wavering that no outside successor-owner or -

developer would have had an incentive to purchase the Debtors' general partnership interests or the current assets of the projects. The motivation for any such purchase would have been profit—in the form of future development fees under the tax-credit program, net revenues, or the residual value of the planned projects. But, there was no chance of reaping any of that because of the way the Debtors' initial management had structured the projects.[15]

The reason for this was, in his opinion, "[t]he pro forma, the financial model by which this whole program was set up, was errant." And, in Saxton's judgment,

> [i]t was errant in all 5 that they built, and ... in all 11 that they proposed; ... because the basic structure was not right, and there [was] no way that it could work.[16]

The flaws, in his estimation, were fundamental. First there was the early exhaustion of development fees from several projects on startup costs, without an escrow for future contingencies over a legally-mandated 15–year term of operation. This was the result of undercapitalization and underestimation of startup expenses and construction costs.[17] Then there were the ongoing errors in the model, the overestimation of revenues and underestimation of

**12.** Deposition of Michael Saxton (taken July 28, 2008) ("Saxton Depo."), Tr. at 30–31.

**13.** Saxton Depo., Tr. at 91. Saxton gave the number of projects under construction in 1998 as five. Saxton Depo., Tr. at 91. Depending on the part of the record consulted, the actual number was only two, or three.

**14.** Saxton Depo., Tr. at 32–33.

**15.** Saxton Depo., Tr. at 39; 44; 49; 52.

**16.** Saxton Depo., Tr. at 44; 75; and (as quoted) 91.

**17.** Saxton Depo., Tr. at 79–80 (construction "underpriced" by Debtors). Saxton repeatedly emphasized the high risk of unanticipated costs arising at any time over the 15–year period of operations that had to be maintained to sustain tax credits for investors in this sort of housing development. Saxton Depo., Tr. at 46–48; 74; 86–87. He saw only one prudent measure to cover the risk: an escrow by the general partner of a portion of the development fees it would receive once the housing units were constructed and rented out, and the operation stabilized. Saxton Depo., Tr. at 58.

expenses and debt service.[18] In Saxton's opinion, all this cumulated to a fatal disincentive to any prospective purchaser of the Debtors' interests, other than an insider or past investor.[19]

"But-for" causation is, obviously, a question of fact. It is not an abstraction. In the context of a business failure alleged to have been the proximate result of a professional adviser's malpractice, the key fact is whether the client would have been able to parlay the problematic situation—a threatened, single transaction or a full, troubled operating enterprise—to success, had the alleged default of the professional, the misadvice relied upon, not occurred. *Yusefzadeh v. Ross*, 932 F.2d 1262, 1265 (8th Cir. 1991) (applying Minnesota state law). The concurrence to the Eighth Circuit's opinion in this very matter recognizes the concrete nature of the Plaintiff's original burden on this element, in a direct pronouncement:

> But to move the matter beyond theory, the trustee will have to prove that there was indeed a market for these tax credits and other assets, such that the corporation was actually damaged by Klane's actions. If the assets were not transferable for substantial value as a practical matter, and if the tax credits were worthless to Senior Cottages itself because the corporation was insolvent and destined for bankruptcy, then the trustee will have suffered little or no damage as a result of the asset-stripping.

*In re Senior Cottages of America, LLC,* 482 F.3d at 1008 (Colloton, J., joined by Loken, J.).

Here, the defense's affirmative evidence would well-support a finding that the Debtors' operations would have collapsed without salvageable value anyway. This goes directly to the nature of "but-for" causation. Its production for this motion shifted a burden of production of evidence to the Plaintiff; and the Plaintiff must carry the burden if a triable fact issue on the element—and beyond, the right to go to trial at all—is to be made out. *Celotex Corp. v. Catrett,* 477 U.S. at 322–324, 106 S.Ct. 2548.

The only relevant evidence produced by the Plaintiff in response is a four-page written opinion in letter format, from one William E. Bryant, a Minneapolis certified public accountant, plus his one-page "Professional Profile."[20] The resume recited

---

18. Saxton Depo., Tr. at 88–89; 39; 44 ("[T]he operating costs were underreported, income was overstated, the terms and conditions of the permanent financing were stated in a manner which would lead one to believe that you would get a bigger loan than what you could actually get ..."); 43 ("... somebody was very, very optimistic with regard to the projections, maybe to the brink of pushing it beyond optimism."); 50 ("... the construction costs were underreported, the income was overreported, the operating expenses were underreported.").

19. Ultimately, the reasons would be twofold. First, as noted earlier, going forward would not have led to any profit for a successor, absent a reorganization that would have required complete renegotiation of all existing terms with contractors and the municipal and state authorities. Saxton Depo., Tr. at 77–78.

Second, even had Senior Cottages brought projects to full construction, excessive debt service and operating expenses would have caused them to fail soon. Saxton Depo., Tr. at 29; 38; 43. This would have caused the associated tax credits—the major incentive to investors—to collapse, promising additional large legal liabilities. Saxton Depo., Tr. at 47–48. This is just what happened later to projects that the Debtors had started. Saxton Depo., Tr. at 41.

20. The Plaintiff also relies on a more lengthy written submission by Kent A. Gernander, Esq., an attorney. In his written report Gernander gave his opinion that the Morris Defendants had had multiple conflicts of interest in their involvements with Klane and the Debtors; that they failed to adequately investigate the facts before the transfer was closed; and that Morris failed to adequately evaluate

Bryant's status as a "Managing General Partner—48 Unit Low Income Housing Development." It also contained a line-entry for "consulting services for Low Income Housing Tax Credit Developers" as one of the types of experience Bryant had had in his work as an independent CPA from 1991–on. Finally, it recited a 20–year status as "100% Owner" of "Network Investments, Inc.," with this line-entry: "Procured $75,000,000 of Tax Credit Awards for Developments." There was no more detail than that for any of these stated experiences.

Bryant opened his opinion by stating that his engagement by the Plaintiff had been to give his opinion "as to the amount of damages suffered by Senior Cottages ... due to the transfer of all of its assets from SCA to Millennium Properties, LLC...." He gave his conclusion as to that amount, in a dollar-based figure.

Bryant then gave his understanding of the nature of "tax credit projects under IRS Code Section 42." He also described a process through which "equity for multi-family housing projects," i.e., housing units for rental to "income qualified tenants," is raised through the syndication of tax credits to investors. He then states:

> It is my opinion that [Senior Cottages] had created assets of value prior to any transfer to Millennium. When those as-

sets were transferred to Millennium, [Senior Cottages] was stripped of those assets and deprived of the opportunity to utilize them.

Bryant identifies the source of this value as one thing only: Senior Cottages' "controlling the land and receiving a tax credit allocation from each state tax housing authority" where it intended to develop a project. He opined that Senior Cottages "would continue to retain value until such time they [sic] decide[d] to sell their [sic] position." That retained value for the eight projects, Bryant opined, "could have been used to negotiate a Sub–Developer position with each Tax Credit Syndicator, or co-venture with a large General Contractor."

These conclusions are worded in a dense pitch of industry-specific jargon, but a fairly terse one. It never quite emerges that the envisioned negotiation of "Sub–Developer position[s]," or a "co-venture" with a new general contractor, would result in Senior Cottages actually receiving money. But, assuming this would happen, the true utility of Bryant's conclusion follows from his observation on page 3 of his report:

> Based upon my experience, a Sub–Developer agreement is possible if the project costs and rental lease-up are achieved as projected.

---

the legal consequences of the transfer. He concludes that the Morris Defendants' departures from "these standards [of care] caused injury to" the Debtors. But, his identification of the injury is only conclusory:

> Had the transfer not occurred, [the Debtors] would have been better off than the transfers left them. They would have retained ownership of their assets and the future cash flows they were expected to generate, which had significant net value. They would have had *the opportunity* to pursue additional financing and investments with the prospect of completing projects and securing forecasted cash flows.

> They would not have been exposed to the breach of contract and fraud claims of DKM II and the Aherns that resulted from the transfers and eventually caused the bankruptcy of [the Debtors] and Millennium [Properties].

(emphasis added). These opinions address legal abstractions, not the concrete; they speak in terms of the loss of ownership, legal control, the right to pursue options. They have nothing to do with the actual, practical wherewithal to exercise such rights and powers, which is the whole point of but-for causation.

Bryant goes on to recite that "[i]n [his] experience the value of the Sub–Developer position ranges between 25% to 33% of the Statutory Developer Fee permitted" under the Internal Revenue Code.

Using that multiplier, he calculates a "Range of Value" for the Debtors' interests in the eight projects in planning in 1998, as a first component of the damages he was engaged to quantify. For a second component of damages, traceable to the three projects on which the Debtors' affiliates had commenced construction by 1998, Bryant uses the "*projected* profits to realize upon the completion and full lease-up of those projects" as the base for determining the likely proceeds of sale of the general partner interests in the projects.[21] Finally—and summarily and without analysis—he adds in $1,212,000.00 in "Projected Developer Profit" as a third component of damages.

This is the sole evidentiary joinder from the Plaintiff that would go to the issue of causality, under either element of the governing case precedent. There is no expanded statement from Bryant, via affidavit or testimony in deposition. The exhibits attached to his report do not add to the analysis at all.[22] Nowhere does Bryant state that he relied on data or evidentiary input other than the Debtors' own projections and their underlying assumptions. It is all a curiously abstract showing, very much an accounting exercise but not much else.

For this motion, the Morris Defendants first "pointed out" that the Plaintiff had no evidence to prove "but-for" causality and resultant damages. They built substantially further, by generating positive and very strong evidence that the Debtors had no feasible, real-life alternative that they were capable of obtaining for their whole development effort, had they retained their assets and not made the transfer to Millennium Properties.[23] This was a responsive showing on the offensive, toward defeating a finding in the Plaintiff's favor on this element and fully supporting a finding in their favor.

The Plaintiff's evidentiary production does not rebut this showing; it does not even hit it square-on, in a fashion to make out a triable issue of fact.

Bryant's opinion does not speak to the concrete, as Saxton's evidence does: a deep and fatal flaw in the Debtors' business plans for all of the projects. Saxton opined that the flaw had already borne its first fruits to destroy any real value in the existing structure while it was in the Debtors' control, and then would dissuade any independent successor-developer from taking up the projects on a purchase for consideration paid to the Debtors. Bryant did not consider anything but the Debtors' abstract projections. He merely took them entirely on their face, assuming that they were fully founded in reality, and were accurate. Saxton's evaluation completely rejected the projections, deeming

21. The emphasis in the quoted language is added.

22. They consist of two things. There is a one-page organizational chart for a "typical low income housing organizational structure," using one of the project-based assets transferred to Millennium Partners as an example. Then there are three pages that are entirely quantified in nature, showing calculations of "stabilized annual cash flows" for each of the eleven projects with "proposed construction loans" that would be "required" for each one to arrive at those cash flows.

23. Saxton stated this most bluntly as follows:

... this was a distress sale situation. They were insolvent. They couldn't produce the product. They couldn't build the projects. They had no alternatives.

Saxton Depo., Tr. at 74.

the undisclosed reality to have deprived the whole operation of sustainability and hence value.[24] To meet that showing, the Plaintiff had to produce countering evidence, based on real-life considerations, to support an attribution of value from redeeming the projections in their own right or outlining an attainable alternative to remedy them. By not doing so, Bryant failed to reach the true issue in play on the element of causation. Ultimately, the Plaintiff's responsive proffer is insufficient to carry the Plaintiff's burden, not the least because it does not speak to the actual, concrete point of material fact.

All the evidence points in one direction on that element, and it is in favor of the Morris Defendants. On this record, a finding is mandated: the Debtors would not have been any better off, in the sense of recovering real value from their foundering operations had Klane not relied on Morris's advice regarding a transfer of their assets to Millennium Properties.

Because this conclusion "renders all other facts immaterial," *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548, the Morris Defendants' concession of triable fact issues on other elements of the Plaintiff's case is of no moment. The Morris Defendants are entitled to judgment on the Plaintiff's malpractice claim against them.

## II. Count II: Aiding and Abetting Breach of Fiduciary Duty

■ To establish a claim for aiding and abetting the tortious conduct of another, a plaintiff must prove the following elements:

1. The primary tortfeasor must have committed a tort that caused an injury to the plaintiff;

2. The defendant-abettor must know that the primary tortfeasor's conduct constitutes a breach of duty; and

3. The defendant-abettor must have substantially assisted or encouraged the primary tortfeasor in the act of breach.

*Witzman v. Lehrman, Lehrman & Flom,* 601 N.W.2d 179, 187 (Minn.1999). A professional person—for example, an attorney or accountant—may be held liable for aiding and abetting the professional's own client in the client's commission of a tort on a third party. *Id.* However, absent a clear, facial breach of the client's duty to the third party, the professional may not be held liable unless the professional had "actual knowledge that the primary tortfeasor's conduct was wrongful." *Id.* at 188.

■ The Morris Defendants challenged the Plaintiff's ability to establish three of the elements of this theory of recovery.

Of this attack, the first prong is the strongest. On the record at bar, the Plaintiff can not establish a component fact for the first element, an actual, measurable injury to the Debtors that resulted from any breach by Klane of his fiduciary duties to them.[25] As a matter of basic logic, the analysis under Count I on causation and resultant damage goes directly to the issue of "injury" under the separate test for aiding and abetting the commission of a tort. The Plaintiff has no evidence to support damage-in-fact, of measurable eco-

---

**24.** Saxton Depo., Tr. at 34, plus other content cited *supra* at nn. 12–19. Saxton pointed out this flaw in Bryant's methodology. Saxton Depo., Tr. at 53.

**25.** The Morris Defendants do not dispute that Klane, as officer, director, and controlling shareholder of Senior Cottages, owed fiduciary duties to the company. No further development of that threshold point of black-letter law is necessary.

nomic value, that did result from the transfer of assets that Klane effected. As a result, he can not prove that an injury resulted from Klane's particular exercise of control over the Debtors, even if that act was a breach of Klane's duty.[26]

The other two points in the defense's attack on Count II are not telling, however.

The first argument is that the Plaintiff has no evidence to establish that Morris knew, at the time of his pre-transfer conversations with Klane, that Klane would execute a transfer for no consideration that would constitute a breach of fiduciary duty.

The defense has a point as to one aspect of this, which stems from the lack of damning, contrary evidence as to the content of Morris's advice. The record would establish that Morris hedged and qualified his statements to Klane, opining that a value-based analysis should be done, founded on an actual appraisal, and that "fair and adequate consideration" then be given to Millennium Properties to deflect challenges to such a transfer to an insider.[27] If that were the only involvement by the Morris Defendants in Klane's actions, the record could support a ruling that the conditional advice had no causative link to any transfer that Klane (an attorney himself) later effected, however suspect and legally vulnerable it might be.

However, the record is also uncontroverted that Morris's partner, Richard Carlson, later drafted at least some of the documents to effect the transfer.[28] And, Morris has not been entirely consistent in his testimony regarding his involvement in the whole sequence of events after his early conversations with Klane.[29] A triable fact issue would emerge from this very basic evidence, on the matters of pre-transfer knowledge, involvement, and results in culpability, *as against both of the Morris Defendants*. In part, this would be

---

**26.** To make out a breach of fiduciary duty by Klane as primary tortfeasor, the Plaintiff relies on an adjudication in his favor in ADV 00–3210. This adversary proceeding was commenced in Klane's own bankruptcy case, by a creditor of the Debtors and of Klane. In it, the Court found Klane liable for damages resulting from the transfer to Millennium Properties, and determined that the debt was excepted from Klane's discharge as the consequence of a breach of fiduciary duty. The Morris Defendants were not parties to that suit; hence they are not bound by the adjudication. In any event, the broader development of the record here would cast some doubt on whether the transfer was an instance of improper self-dealing anyway. Saxton, the Morris Defendants' expert witness, stated that an insider of a troubled developer of tax-credit-financed housing is often the only potential purchaser of the entity or its assets, if the project is foundering due to bad planning or unforeseen contingencies. In Saxton's opinion, an insider or affiliate of the developer, or a past buyer of the project's tax credits, might have enough familiarity and expertise to salvage the operation, with or without new capital. And, more to the point, such an insider would have the stronger conceivable motivation—the wish to salvage profit, or to avoid the collapse of the tax credit structure and all that would entail. Saxton Depo., Tr. at 51; 63; 67. At the very least, this evidence would create a triable issue of fact (and law) as to an actual breach of duty on Klane's part, in the mere fact of a transfer for no consideration to an insider-successor. (This observation also goes to the rhetorical query made by the Plaintiff's counsel in argument, when she questioned why Klane would have made the transfer, if the assets had no current value as the Morris Defendants were arguing.)

**27.** Morris 2001 Depo., Tr. at 64 and 66; Morris 2008 Depo., Tr. at 44; 45; 55–56.

**28.** Morris 2001 Depo., Tr. at 40.

**29.** *E.g.*, Morris 2001 Depo., Tr. at 76 (Morris "still advising" Klane "concerning the SCA, SCM, Millennium situation" in October, 1998), and Morris 2008 Depo., Tr. at 48–49.

due to Carlson's status as a member of the defendant law firm.

For the same reasons, there would be a triable fact issue over the element of substantial assistance or encouragement to the commission of the underlying tort. Carlson's take-up of involvement, toward the consummation of the transfer, would raise just too many questions; the evidence could not be assigned an exclusive, unilateral thrust on this element.

However, these points are extraneous, because under *Celotex Corp. v. Catrett* the failure of proof on the matter of an injury eliminates from consideration all other facts and any issues over them. 477 U.S. at 323, 106 S.Ct. 2548. Because of the failure of evidence as to an essential element of the Plaintiff's aiding-and-abetting claim, the Morris Defendants are entitled to judgment on it as well.

### III. *In Pari Delicto* Defense

The disposition of both counts on their merits moots the Morris Defendants' affirmative defense of *in pari delicto*. Thus, though it was advanced and argued on this motion, it will not be addressed.

### ORDER FOR JUDGMENT

On the memorandum of decision just made,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The motion of Defendants Richard Morris and Morris, Carlson, Hoelscher, P.A., for summary judgment is granted.

2. The Plaintiff is not entitled to an award of damages against Defendants Richard Morris and Morris, Carlson, Hoelscher, P.A., under either count of his complaint.

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERM 2.